Merrimack, ⎰
Dec. 31, 1903. ⎱

CARNEY, *Adm'r*, v. CONCORD STREET RAILWAY.

In an action against a railway company for negligently running upon a child so young as to be incapable of exercising care, a verdict cannot be directed for the defendants unless the evidence establishing their freedom from fault is so definite and convincing that fair-minded men could not differ in their conclusions upon that question.

Where a course of conduct adopted in a sudden emergency is alleged to be negligent, the question for determination is not whether the party charged acted according to his best judgment, but is whether he exercised the prudence of the average person under the same circumstances; and that question is one of fact for the jury, and not one of law for the court.

A remark of counsel in closing argument to the effect that ordinary care requires the use of fenders upon street cars propelled by electric power, and an instruction to the jury that the company is bound to exercise average prudence in so equipping cars, furnish sufficient cause for setting aside a verdict, when it appears that there was no evidence as to the character, utility, mode of operation, or extent of use of such appliances.

In the trial of an action to recover for injuries resulting in the death of an
infant intestate, the jury should be instructed upon the question of dam-
ages as to the legal incapacity of the decedent to earn money for himself or
his estate during his minority.

CASE, for negligence causing the death of the plaintiff's intes-
tate, David S. Carney. Trial by jury and verdict for the plaintiff.
Transferred from the October term, 1902, of the superior court by
*Wallace*, C. J.

The plaintiff's testimony tended to prove the following facts:
The intestate was the plaintiff's son, twenty-one months old,
thirty-one inches tall, intelligent, and physically strong. He could
walk quite well for a child of that age. On the day before the
accident the plaintiff moved into a house situated on the north-
erly side of a street leading to Contoocook River Park in Concord.
The defendants owned a right of way upon the north side of the
street and maintained a street railway upon the right, operated by
electricity. There was a path leading from the house across the
railway track to the street. The space between the rails at the
crossing—three feet in width—was covered by plank about four-
teen feet in length. There was also a driveway leading from the
house to the crossing, and another path leading from the house to
the railway at a point some distance easterly of the crossing.
There were three planked crossings in the railway opposite houses
easterly of the Carney crossing—one at a distance of 110 feet,
another at a distance of 220 feet, and the third at a distance of
486 feet. There were bushes two or three feet high on the north-
erly side of the railway and easterly of the Carney crossing, which
in the summer partially obstructed the view of the Carney drive-
way and foot-path, and the space between the house and railway,
to a person standing on the front platform of a car (where the
motorman usually stands) approaching the crossing from the east.
A person in that position could see the crossing itself for a dis-
tance of 200 to 300 feet before reaching it.

About ten o'clock in the forenoon of August 11, 1901, the
intestate, unobserved by the plaintiff and the members of his fam-
ily, walked out of the house on to the railway track at the cross-
ing, and was struck by one of the defendant's cars while making a
regular trip in a westerly direction. No one saw the child before
or at the time of the collision, unless the motorman saw him.
When the car was some 220 feet easterly of the crossing, it was
going at the rate of six or eight miles an hour. The car bell was
rung a continuous clang from a point 220 feet from the crossing
until the brakes were set. When the car stopped the child laid
near the southerly rail, three or four feet from the westerly end of

the crossing, with his head pinned under the rear motor. He did not appear to be seriously injured, except that he was unconscious. There was little or no blood on his head, and the back of it was not crushed. An attempt was made by the plaintiff and others to remove him, but it was found to be impossible. There was more or less discussion as to how it could be done. The conductor proposed to start the car forward. The plaintiff objected, and suggested that the car be backed, or that a jack be obtained from a mill in the vicinity, or that a near-by telegraph pole be procured, and the car be raised from the child by one of these instruments. The defendants' servants started the car ahead three or four feet, and the child was rolled over the end of the planking and his head was crushed—the blood gushing out of his mouth and ears. He was then taken out and died in a few minutes. It was about five minutes from the time he was struck until he was extricated. The plaintiff testified, on cross-examination, that he complained of the child's being struck by the car, and of the manner in which the car was started to liberate him, but that the conductor acted honestly, and in his excitement wanted to do what was best to get the child out. The motorman has since died. The jury had a view of the place and the car. The car was twenty-eight feet long over all, and the under side of the sill at the end was twenty-eight and a half inches above the rail. It had no fender. The defendants' motion for a nonsuit was denied, subject to exception.

The defendants' testimony tended to prove the following facts: The motorman at the time of the accident, and shortly before it, was alone on the front platform, looking ahead and attending to his duties, with nothing to distract his attention from them. He rang the bell at the crossings and the foot-path easterly of the Carney crossing, and at that crossing. He quickened the ring and set the brake when the front end of the car reached the easterly end of the crossing, stopping the car so quickly as to throw the passengers forward. The car did not move more than half its length after the brake was set. When the car stopped, the rear motor was within six inches of the westerly end of the crossing and held the child's head, the body being on the ground beyond the planking. There was discussion as to the best way to free the child. The conductor thought the best way was to start the car ahead, and did so, about six inches to a foot. One of the defendants' witnesses testified that some gentlemen standing there objected. There was no blood excepting where the child's head laid. The conductor had had two or more years' experience, and had run on that route some sixteen months. He heard no one ask him to get a jack or telegraph pole to raise the car, and thought the plaintiff gave him permission to start the car ahead. He re-

garded that as the only safe and quick way to release the child. The bottom of the motor was four and three eighths inches above the planking, and its lower edge was only three inches from the planking. The iron that holds the draw-bar in place was seventeen and a half inches above the planking; and the bunter, which stands out prominently in front of the car, was twenty-nine and a quarter inches above the planking. The testimony of the physician who examined the child tended to show that the injury to the base of the head could, and probably did, cause death, and was more likely to have been caused by a blow than by pressure. Photographs taken the next day after the accident—one with the camera placed eighty-four feet easterly of the Carney crossing, and the other with the camera placed further east—were introduced in evidence. The defendants' motion to direct a verdict in their favor was denied, subject to exception.

The plaintiff's counsel in his closing argument said that ordinary care required the defendants to use a fender in running cars through this populous neighborhood, and to this remark the defendants excepted.

The following requests by the defendants for instructions were denied, subject to exception: " (1) To entitle the plaintiff to recover, he must show that the defendants' motorman saw the child and realized his danger in season to stop the car before hitting him. (2) The child was not a traveler, but a trespasser; and if the motorman, upon discovering the child, stopped the car as quickly as he could by the exercise of ordinary care, the verdict should be for the defendants. (3) Neither the defendants nor their servants were required to anticipate that trespassers would be upon their right of way. (4) The defendants were not required to fence their right of way against trespassing children. (5) There is no evidence that the construction of the car was not the universal construction of electric cars."

The following instructions were given, subject to the defendants' exception: " (1) It was the duty of the defendants to equip their cars with such safety appliances as men of average prudence would use under the same circumstances. They were not bound to adopt all such devices as are put upon the market; but if they failed to use such safety appliances as reasonably prudent men would use in the same circumstances, and if their failure to use such safety appliances caused or contributed to cause the injury, the defendants are liable. If a person of average prudence would not have used a fender upon a car under the same circumstances, then the defendants are not liable on this ground. (2) It was also the duty of the defendants, by their servants and agents, after the child was knocked down, to exercise ordinary care to avoid

injuring him by moving the car in an improper manner. In removing the child from under the car after it came to a standstill, if the conductor and motorman exercised ordinary care and did that which a person of average prudence would have done under like circumstances in a like emergency, the defendants are not liable on this ground. If the defendants failed to perform their duty in this respect, and negligently moved the car, and the child's death was due to this cause, they are liable. (3) Something has already been said that you would take into account, in determining whether this motorman and conductor exercised due care, the fact that there were bushes beside the road. You will take into account the existence of the bushes as determining whether they would conceal the child from view; and also you will take into account the existence of the bushes, as to whether the conductor and motorman would be required, as men of ordinary care, to take greater pains to avoid an injury if the place was concealed or covered by something about which they knew."

On the question of damages, the defendants requested the following instruction: "The child being unable to earn, the jury should consider the expense necessary to support and provide for him until he reached an age when he could earn; and also his liability, on account of his tender age, to die. Damages can only be allowed for prospective earning power, less the probable cost of raising him to the time when he could earn." The following instruction was given: "The plaintiff is entitled to recover, if anything, for the reasonable expenses occasioned to the child's estate by the injury. You will consider the age of the child, the probable duration of his life but for the injury, taking into account his liability to die on account of his tender age, and his probable earning capacity in the future; and taking into account these elements of damages, you will give such damages as you think the plaintiff is entitled to." The defendants excepted to the denial of their request and to the instruction given.

*Martin & Howe*, for the plaintiff.

*Albin & Shurtleff* and *Mitchell & Foster*, for the defendants.

CHASE, J. The intestate being so young as to be incapable of exercising care for his safety, and negligence (if any) of his parents not being imputable to him, there is no question of contributory negligence in the case. *Bisaillon v. Blood*, 64 N. H. 565; *Warren v. Railway*, 70 N. H. 352.

The exceptions to the denial of the defendants' motions for a nonsuit and for the direction of a verdict in their favor present

the same question, namely : whether in the whole case there is any substantial evidence tending to prove the affirmative of the issues made by the pleadings. *Burnham* v. *Railroad*, 69 N. H. 280, 282. Or, expressing the question in another form : assuming the truth of the evidence and construing it most favorably for the plaintiff, does it conclusively appear therefrom that the defendants were not negligent ? Must all fair-minded men arrive at that conclusion upon considering it, or might some arrive at the opposite conclusion ? If the latter be the fact, the denial of the motions must be sustained. *Hardy* v. *Railroad*, 68 N. H. 523.

The controlling fact involved in one feature of this question is the relative positions of the child and the car when the child was in a place of apparent danger of collision with the car, and the car was at a place from which the motorman saw the child, or by the exercise of ordinary care could see him. If the child was on the Carney crossing when the car was 200 to 300 feet distant, fair-minded men not merely might find, but should find, that the motorman saw him, or in the exercise of ordinary care ought to have seen him, in season to stop the car before it reached him, and to have realized that he was a child of such tender age as to be incapable of exercising care for his own safety, or of being warned of his danger by the ringing of the bell. On the other hand, if the child did not come into the view of the motorman until the front end of the car reached the easterly end of the crossing, and by reason of the presence of bushes or other cause would not have come into view although the motorman exercised ordinary care in his endeavor to discover the presence of any one dangerously near the crossing, fair-minded men could not properly find that the defendants were in fault for running against the child. *Gahagan* v. *Railroad*, 70 N. H. 441. Between these extremes the relative positions may have been such at times that fair-minded men might differ in their conclusions respecting the conduct of the motorman. The car was approaching the crossing at the rate of six to eight miles an hour, or approximately nine to twelve feet a second. Its position at a given second before the collision can be determined with reasonable certainty. But the evidence relating to the position of the child is very meagre and uncertain. No one saw him after he left the house, unless the motorman saw him. The evidence that the car bell was rung a continuous clang while the car was passing over 220 feet of the track is relied upon by the plaintiff to prove that the child was discovered by the motorman in a place of apparent danger when the car was that distance away. If it appeared that the only occasion for ringing the bell was to warn a person discovered in a position of apparent danger, of the approach of the car, the evidence would have much weight in support

of this proposition. But there were three crossings and a foot-path within this space, each of which furnished an occasion for ringing the bell. When it is considered that it took only ten to thirteen seconds to go from one of these crossings to the next, it will be seen that if the bell was rung as a warning of the approach of the car to the crossings it would be rung nearly, if not quite, continuously during the passage over this portion of the track. Just what is meant by a "continuous clang" of the bell is not apparent. If it means that the bell was rung with a rapidity or emphasis that was unusual for signaling the approach to crossings, the evidence would have a tendency to sustain the plaintiff's position. The defendants' evidence, that the ringing was accelerated and the brake was suddenly and firmly set when the front end of the car reached the easterly end of the Carney crossing, tended to prove that the motorman then discovered a new or additional danger. It cannot be said that reasonable and fair-minded men might not arrive at opposite conclusions as to the cause for this ringing of the bell. The ringing was evidence of such doubtful and equivocal character respecting the discovery of the child that its meaning and bearing were properly submitted to the jury. *Bartlett* v. *Hoyt*, 33 N. H. 151; *Hall* v. *Brown*, 58 N. H. 93; *Tyler* v. *Railroad*, 68 N. H. 331. Neither can it be said that fair-minded men might not reasonably arrive at diverse conclusions in reference to the point from which the motorman, if he exercised ordinary care, would first discover the child and see that he was in apparent danger of colliding with the car. Although the motorman was alone upon the platform, and was looking ahead apparently attending to his duties with nothing to distract his attention, he may have fixed his attention upon too limited a portion of the track and its surroundings. It must be assumed that the crossings were put into the track to enable people conveniently to pass from one side of it to the other. The presence of a house near by was conclusive evidence that people might have occasion to use the crossing, even if the house was not occupied. It was liable to be occupied at any time. The record shows that the defendants were conscious of this liability, for they say they rung the bell on approaching this crossing. If the child might be regarded as a trespasser, the defendants would not be relieved by that fact from exercising ordinary care to prevent injuring him after they discovered or ought to have discovered his presence there. *Edgerly* v. *Railroad*, 67 N. H. 312; *Mitchell* v. *Railroad*, 68 N. H. 96; *Buch* v. *Company*, 69 N. H. 257, 260, 261; *Wheeler* v. *Railway*, 70 N. H. 607. If the motorman had no reason to suppose a child would be trespassing upon the track (*Shea* v. *Railroad*, 69 N. H. 361), he might have discovered the child's presence on or danger-

ously near to the track while looking for persons whom the defendants, by providing the crossing, invited to use it. *Pickett v. Railroad*, 117 N. C. 616,—30 L. R. A. 257. The discovery of the child's presence would be the material fact—not the manner or the cause of making the discovery. *Davis v. Railroad*, 70 N. H. 519. There were bushes two or three feet high on the same side of the track as the house, which at that season of the year partially obstructed the view of the driveway, foot-path, and ground between the house and the track, to a person on the front end of a car passing along the track. The jury had a view of the place and saw the nature and extent of this obstruction. The photographs exhibited to the court show that the house was but a short distance from the track. A considerable portion of the surface of the driveway between the house and the crossing, and nearly all of the seven steps leading from the ground to the piazza of the house, can be seen in one of the pictures; while in the other, no portion of the driveway can be seen, and only the two upper steps and a portion of the third, by reason of the bushes. The facility for seeing objects in the driveway, foot-path, and adjoining spaces between the house and the track, from the front platform of a car passing over the track, varies with the position of the car. It is enough for the present purpose to say that it does not conclusively appear from the record and the pictures that reasonable and impartial men might not find that the motorman would have discovered the presence of the child in a position of apparent danger in season to have stopped the car before reaching the child, if he had exercised ordinary care in looking out for persons at the crossing. This is especially true of men who have been upon the ground and have seen the objects upon it as the motorman saw them.

A further question relates to the conduct of the conductor in moving the car to release the child from his position after the accident. The plaintiff's testimony tended to prove that the conductor acted honestly, and apparently wanted to do what was best to get the child out. The defendants argue from this that the conductor acted according to his best judgment, and say that if he did so, being called upon to act in an emergency in which the life of a human being was in peril, his principals are not liable as matter of law though his judgment was erroneous. The question of the competency of the testimony was not raised, and has not been considered. If competent, the question what inference should be drawn from it,—whether that the plaintiff acted according to his best judgment, or some other inference,—should be submitted to the jury. Assuming that the jury must find from it that the conductor acted according to his best judgment, what would be the effect of the finding upon the defendants' liability?

Negligence is the want of ordinary care, or such care as persons of average prudence would exercise under the same circumstances. "A mere error of judgment is not necessarily negligence." *Folsom* v. *Railroad*, 68 N. H. 454, 460. Men of average prudence sometimes err in judgment. On the other hand, the mere exercise of one's best judgment is not necessarily ordinary care. Men of average prudence sometimes arrive at erroneous conclusions from a heedless or careless consideration of the subject before them, or from want of ordinary care in other respects. If a person is suddenly called upon to act in an emergency involving the safety of the life or limb of a human being, this fact must be taken into account in determining the quality of the act. The excitement incident to such situation naturally affects the judgment of a prudent man and has a tendency to prevent it from doing its best work. But this circumstance does not change the question as to the quality of the act in respect to carefulness from a question of fact to one of law. If the circumstance causes an error of judgment, and as a consequence an injurious act, the act is not necessarily negligent. It might be found that men of average prudence would act in the same way under the same circumstances. Conversely, the act is not necessarily prudent because prompted by the best judgment of the actor. It might be found that men of average prudence would not so act under the same circumstances. Whether it is the one or the other is purely a question of fact to be determined by the jury, "in view of their experience in the affairs of life,—their knowledge of the motives that govern human action and of the conduct of reasonably prudent men in similar exigencies." *Folsom* v. *Railroad*, 68 N. H. 454, 460 ; *Warren* v. *Railway*, 70 N. H. 352. " What constitutes negligence in a given exigency is a question for the jury, and not for the court." *Paine* v. *Railway*, 63 N. H. 623 ; *S. C.*, 58 N. H. 611, 614, 615.

In *Wynn* v. *Railroad*, 133 N. Y. 575, cited by the defendants, the question was whether there was any evidence tending to show a want of skill and care on the part of the driver of the defendants' horse-car when the plaintiff (a passenger) was injured; and the court, after pointing out that there was not " a particle of evidence tending even remotely " to prove such fact, use the language relied upon by the defendants in this action : " He [the driver] was confronted with a sudden emergency ; and we cannot now say that his action was not the best that could have been performed under the circumstances. Even a failure to exercise the best judgment which the case rendered possible cannot be claimed as evidence of a lack of care or skill. We do not, however, see any evidence that in fact there was such failure." Bearing in mind that this language was used in the discussion of the question as

one of fact, it is not inconsistent with the views above expressed. *Stabenau* v. *Railroad*, 155 N. Y. 511, is a similar case. *Bittner* v. *Railway*, 153 N. Y. 76, another case cited by the defendants, falls short of supporting their position. When the case was before the superior court it was held,—one judge dissenting,—that error of judgment on the part of one who negligently injures another cannot be invoked as a defence in his behalf. 12 N. Y. Misc. 514. In the court of appeals it was held, in substance, that the jury should have been distinctly instructed that if, in what the defendants' motorman did, he used his best judgment, the defendants were not responsible, even if it was an error and caused the alleged injury. At the same time the court say that if the jury could believe the testimony of one of the plaintiff's witnesses relative to the movements of the car, they could perhaps find that the motorman was negligent. But how would it be if the motorman, acting under great excitement, acted according to his best judgment,— the electric power governed by his acts operating more promptly and to a greater extent than he anticipated? There seems to be inconsistency in the opinion. The decision relating to the instruction that should have been given to the jury, if it is correctly understood, cannot be followed in this jurisdiction. It conflicts with principles of law firmly established, to which reference has been made. In any event, the question whether the motorman exercised his best judgment was regarded as one of fact for the jury; and the decision to this extent supports the rulings in this case at the trial term. A consideration of the later case of *Lewis* v. *Railroad*, 162 N. Y. 52, raises a doubt whether the decision in the Bittner case is correctly understood. In the Lewis case the jury were instructed that if they found that the engineer of the defendants' train, after seeing the horses attached to the coach in which the plaintiff was riding, omitted to do any act which might have prevented the collision or lessened the plaintiff's danger, the defendants were guilty of negligence. This was held to be erroneous. The court, after saying that the charge was in direct conflict with the principles of the Wynn, Stabenau, and Bittner cases, proceed as follows (*p.* 62): "The short period of time in which he [the engineer] was obliged to act, the impending danger to his train, to himself, to his passengers, and to others, with the consequent excitement attending such a situation, the various acts required to stop or lessen the speed of the train, and all the other circumstances surrounding him at the time, should have been presented to the jury and considered by it before it could properly find the defendant negligent by reason of the acts of its engineer." The question for determination upon a consideration of such facts, in a case in this state, would be, not whether the engineer acted accord-

ing to his best judgment under the circumstances, but whether he acted as a man of average prudence would act. *Folsom* v. *Railroad*,. 68 N. H. 454. It would certainly be a new departure to hold that the jury should be instructed that if the engineer acted according to his best judgment, the defendants were not in fault. *Paine* v. *Railway*, 58 N. H. 611, 614, 615; *Huntress* v. *Railroad*, 66 N. H. 185, 190; *Davis* v. *Railroad*, 68 N. H. 247, 250; *O'Leary* v. *Railway*, 177 Mass. 187; *Whitman* v. *Railway*, 181 Mass. 138. There being no contributory negligence on the part of the plaintiff's intestate, *Rhing* v. *Railroad*, 53 Hun 321, and *Rider* v. *Railway*, 171 N. Y. 139, are not in point.

The question upon this branch of the case raised by the defendants' exceptions, therefore, is not whether it conclusively appears. that the conductor acted according to his best judgment, but whether it thus appears that he acted as men of average prudence would act under the same circumstances. The accident to the child had happened, and the car had been stopped. All the agencies involved in bringing him under the car had ceased, and a new situation existed. See *Weitzman* v. *Railway*, 33 N. Y.. App. Div. 585. The question then was: what should be done to release the child from his perilous position? The situation required the formation and execution of plans in the briefest possible space of time. There was a discussion among those present. as to the plan that should be adopted. The evidence is conflicting regarding this matter. The conductor thought the best way was to move the car ahead. The plaintiff's evidence was that he objected to this course, and suggested.that the car be lifted from the child by means of a jack or lever. The defendants' evidence was that the conductor did not hear the objection and suggestion, but acted under the impression that the plaintiff consented to the plan proposed. The fact involved in this conflict of testimony manifestly has a bearing upon the question of ordinary care, and it was the province of the jury to find the fact from the conflicting testimony. The conductor's plan seemed to contemplate the moving of the child's body forward from the planking of the crossing to the ground by means of the motion of the car, a portion of which touched the child, and thereby to enlarge the space underneath the car. It is impossible to suppose that he thought' the rear motor, the lower edge of which was only three inches above the planking, would pass over the child's head and body without injuring them. It is equally impossible to suppose that all fair-minded and reasonable men would find that men of average prudence would have adopted this plan under the circumstances. The question was peculiarly one of fact requiring determination by a jury. The defendants' motions were properly

denied, so far as they related to each branch of the question of negligence presented by the record.

It will be seen from the foregoing views that the court are of opinion that there was evidence in the case which warranted the instructions to the jury numbered 2 and 3 in the record. No error of law has been discovered in these instructions, nor in the denial of the defendants' requests for instruction, except the one relating to the absence of a fender.

In the closing argument, the plaintiff's counsel said that ordinary care required that the defendants should use fenders upon their cars when running through such populous neighborhoods as that where the accident occurred. The defendants excepted to this, and also to the instruction of the court to the jury (numbered 1 in the record) upon the subject of safety appliances and fenders. The argument and instruction would be unobjectionable if there was evidence in the case to warrant them. It appeared from the view that the car had no fender; and this was the only evidence on the subject. The character, mode of operation, utility, and extent of use of safety appliances and fenders for street cars operated by electric power are not matters of common knowledge. It cannot be presumed that the jury had knowledge of these matters. The burden was upon the plaintiff to prove that the absence of a fender constituted negligence. This burden was not sustained by simply proving that the car had no fender. It was necessary to prove further that ordinary care required that there should be a fender. This would involve, among other things, a description of the apparatus, the way in which it operates, the result of its operation, etc. Even if expert testimony were necessary (which is doubtful), that circumstance does not avoid the necessity of proof, as the plaintiff seems to argue. The defendants were not called upon to antagonize the allegation by proof until some evidence was introduced in support of it. It is difficult to understand how the defendants could be benefited, as the plaintiff argues, by the omission to prove his allegation, when the question was presented to the jury by him in the closing argument, and by the court in the charge, as if the plaintiff had laid before the jury sufficient evidence to sustain a verdict in his favor on the point if they credited the evidence. On the other hand, it appears that such course must be prejudicial to the defendants by leading the jury to understand that the mere absence of a fender was sufficient evidence of negligence. The exceptions under consideration are sustained, and as a consequence the verdict must be set aside.

This disposes of the case; but it seems advisable to consider one aspect of the defendants' exception to the charge of the court

relating to damages, as the question will necessarily arise upon a new trial. The cause of action for a tort of this kind survives the decease of the injured party, subject to certain modifications and limitations with respect to damages. P. S., c. 191, s. 8. The remedy provided by the earlier statutes on the subject was an indictment upon which the wrongdoer, if found guilty, was fined,—the fine going to the deceased party's widow or heirs-at-law. Laws 1850, c. 953, s. 7. In 1879, a civil form of action to recover "damages for the injury" was substituted for the criminal form. Laws 1879, c. 35, s. 1. By the act of 1887 (c. 71), the damages recoverable in the action were enlarged, and the elements to be considered in assessing them were specified to some extent. They were "damages for the injury to the person and estate" of the deceased party by the "wrongful act or neglect and consequent death"; and in assessing them, "the mental and physical pain of the injured person, the expense occasioned to him in his life and to his estate upon his decease, his age, and his probable duration of life and earning capacity, but for said wrongful act or neglect," were to be considered (s. 1). The present statute specifies the same elements of damage, in slightly different form, but without any change in substance. P. S., c. 191, s. 12. So, it appears that the damages are to be assessed on the basis of the loss suffered by the deceased party and his estate,—not the loss suffered by his surviving relatives, although the damages when recovered go to them. *Clark* v. *Manchester*, 62 N. H. 577; *Warren* v. *Railway*, 70 N. H. 352, 362. The "earning capacity" of the deceased, or, as it is expressed in the present statute, "his capacity to earn money," must be understood to mean capacity to earn money for his estate. When, as in this case, the deceased is an infant of tender years, he has no present capacity for earning money for himself or any one else; but the capacity referred to is not limited to the time of death; it is the capacity that would exist during life but for the injury. Besides the physical incapacity of an infant, he is under a legal incapacity to earn money for himself or his estate during his minority; for, unless he has been emancipated, his earnings belong to his father, if living, or in case of the father's death, to the mother,—a right arising from the duty of the parent to support and educate the child. *Jenness* v. *Emerson*, 15 N. H. 486; *Hammond* v. *Corbett*, 50 N. H. 501. If the child were emancipated, he would need to use his earnings to pay the expenses of his support and education, and ordinarily there would be little if any balance left. While the jury should not have been instructed, as requested by the defendants, that damages can only be allowed for prospective earning power, less the probable cost of raising the intestate to the time when he

could earn money, they should have been instructed, and if the defendants' request had been to that effect probably would have been instructed, in reference to the legal incapacity of the intestate to earn money for his estate during minority.

*The exception relating to argument and charge concerning the absence of a fender sustained: other exceptions overruled.*

All concurred.