Merrimack,
March 1, 1927.

### MARJORIE CASTONGUAY *v.* ACME KNITTING MACHINE & NEEDLE COMPANY.

*Murchie & Murchie (Messrs. Robert C. Murchie* and *Alexander Murchie* orally), for the plaintiff.

*Robert W. Upton, Joseph C. Donovan,* and *Lucier & Lucier (Mr. Upton* orally), for the defendant.

ALLEN, J. [ The plaintiff's position that she was an invitee rather than a licensee or trespasser is not to be upheld. Whatever might be the situation if the defendant's manager had been the owner of the property and business, his authority as manager included no right to do things not relating and incidental to the business. The defendant was not bound by acts not within the scope of his real or apparent agency. ]

As to his actual authority, there is no evidence that he had any beyond what his position as manager implied. As to this, while rep-

resenting the owner, he did so only in respect to matters concerning the business, and management of the mill conveyed only authority to carry on the business in a usual and ordinary manner. He was not the owner's *alter ego*. While as manager he was a general agent in the conduct of the business, he was not the owner's agent to use the property or permit its use for purposes outside or foreign to the business. His authority of control and direction, while it gave him the right to devote the property to purposes in promotion of the business carried on, gave him no right to devote it to the uses and purposes of others. And the absence of express instructions implied no discretionary authority on the subject, since the subject was outside the scope of the business of the mill. Authority "to act without restriction or qualification in all matters relating to the business of his principal" (*Schwartz* v. *Company*, 82 N. H. 177, 178) does not cover matters not relating to the business. So far as appeared, the plaintiff's visit "could have no tendency to forward the business or promote the interests of the defendant." *Norris* v. *Company*, 206 Mass. 58, 61.

"The fact that it [the defendant] may be chargeable with knowledge that strangers frequently came upon the premises, and were suffered to remain there without actual objection, is not [by itself] sufficient evidence that the camp boss was authorized by the defendant to charge it with the legal responsibility of a landowner to his guest, by inviting his friends to come to the camp, not for any benefit or advantage to the defendant in its business, but simply for their enjoyment or pleasure." *Hobbs* v. *Company*, 74 N. H. 116, 119. "While it could not be found that the men had authority to invite a visitor because of their positions in charge of the work, or because the presence of such invitee would directly promote the defendant's business, it could be found that they had such authority from the fact that the defendant undertook to there maintain for them a place of abode." *Hobbs* v. *Company*, 75 N. H. 73, 81.

The plaintiff's claim that there was evidence of a mutuality of interest between the parties in the manager's testimony that his consent to the visit was given out of interest to maintain friendly relations with the people of Franklin is not supported by the record, which shows that the manager, instead of admitting, denied that such an interest was in his mind at the time. While it is suggested that he made such an admission in a deposition, yet if the deposition can be so construed, it was not positive evidence at the trial but its effect was merely to destroy his testimony. *Lydston* v. *Company*,

75 N. H. 23, and cases cited; *Hobbs* v. *Company*, 75 N. H. 73, 74; *Duval* v. *Company*, 82 N. H. 543. So far as the evidence shows, in his consent to the visit of the students and arrangements therefor, the manager acted solely to assist the cause of public-school education.

Respecting the manager's apparent authority, "When it is said that a principal is bound by an act his agent was not expressly authorized to do, because it was within the apparent scope of his authority, by it is intended that the act is one the principal held out the agent as having authority to do. *Atto* v. *Saunders*, 77 N. H. 527, 529. In short, by it is intended that the principal has either so conducted his business as to give third parties the right to believe that the act in question is one he has authorized his agent to do, or that it is one agents in that line of business are accustomed to do." *Davison* v. *Parks*, 79 N. H. 262, 263.

Under this definition apparent authority may not here be found. There was no evidence of a practice or custom for the manager or for mill agents in general to invite persons to visit the mill for reasons not connected with its business. Still less is there any common knowledge to such effect. Management of the mill, therefore, gave no ostensible right to make the mill an educational clinic. Charge of the property in connection with the business would not naturally or reasonably lead one to infer that its charge for purposes not so connected had been entrusted to the manager. There was nothing reasonably indicating a charge and control in excess of the limitation of authority implied by the scope of the business, and the apparent scope of the business indicated nothing beyond its actual scope.

It is therefore unnecessary to consider whether there was evidence from which the plaintiff's standing as an invitee might be found, had the manager been given authority to invite her for the purposes of her visit, or whether it is the law here that an implied "invitation extends only to those who come on business connected with that carried on at the place, and for the transaction of which the place is apparently intended." *Plummer* v. *Dill*, 156 Mass. 426, 428.

Not being an invitee, the plaintiff was either a trespasser or licensee. There is nothing in the record to show that visitors having no business with the mill were permitted entrance. There is no presumption that they were. Nor is there any evidence of custom charging the defendant with notice from which acquiescence might be implied and found. The right of the plaintiff to enter rested wholly on the manager's authority to admit her. As already appears, he

was without authority to invite. Lacking authority to invite, he also lacked authority to permit without invitation. It was not within his real or apparent charge of the business to authorize the admission of strangers having no business connected with that of the mill and expose the owner to the liabilities therefrom resulting. It was not necessary or reasonably incidental to the conduct of the business, and there was no evidence from which others might be found to have been given the right so to understand.

Since the manager had no express, implied or apparent authority either to invite or permit visitors to enter the mill for purposes solely their own, it follows that the plaintiff was a trespasser.

It then remains to be considered if the defendant was chargeable with notice of her presence, so as to give her the rights of a known trespasser. ". . . the principal is not charged with his agent's knowledge regarding a particular transaction unless the latter's acts in respect to it were within the scope of his employment." *Warren* v. *Hayes*, 74 N. H. 355, 356.

In *Dearborn* v. *Fuller*, 79 N. H. 217, the owner of an automobile was held not liable for his driver's negligent operation of it to a passenger whom the driver without authority invited to ride. On the claim that the driver's knowledge of the passenger's presence was chargeable to the owner, the court said: "when the agent acts in this dual way knowledge on his part is not chargeable to his principal." The case was followed in *Ellsmore* v. *Director-General*, 80 N. H. 100.

While in both of these cases the agent or servant acted in disobedience of an express rule in receiving the passenger, the absence of such a rule here does not change the situation. *Wilkinson* v. *Company*, 79 N. H. 335. Authority being lacking, what the manager did was his and not the defendant's affair. The plaintiff was placed by her teacher in his charge in respect to her safety, and not in the defendant's.

The pilot who conducted the group through the mill acted for the manager and stood in his place. The defendant gained no information from the manager's transfer of charge from himself to the pilot. What the pilot did was merely to carry out the manager's personal undertaking to have the students guided on their tour of inspection.

But the operator of the machine in which the needle broke had nothing to do with the plaintiff's visit. He was aware of her presence and his knowledge was that of the defendant. And if in starting the machine or in failing to stop it while she stood near it, he could be

6

found at fault for negligent conduct, his negligence would be charge-able to the defendant. While there was no duty to provide safe conditions for her, there was a duty to refrain from negligent con-duct towards her as a known trespasser. *Davis* v. *Railroad*, 70 N. H. 519; *Myers* v. *Railroad*, 72 N. H. 175; *Hobbs* v. *Company*, 75 N. H. 73; *Nappi* v. *Railway*, 78 N. H. 261; *Ellsmore* v. *Director-General*, *supra.*

As generally expressed, the defendant was liable for negligent acts of intervening force after the plaintiff's presence became known. In *Buch* v. *Company*, 69 N. H. 257, the continuance of a force al-ready in operation when the trespasser's presence became known was held not to be intervention, but the limitation has since become broadened, and the test of distinction between static conditions and dynamic acts within the party's control, as expressed in *McCaffrey* v. *Company*, 80 N. H. 45, 55, defines the law as now here in force. Negative conduct in failing to stop a force in active operation may be as careless towards a trespasser as positive conduct in putting such a force into operation. Not to shut off an electric current in a broken wire about which trespassing children are seen to be playing may be as negligent as to turn on a current under such condi-tions. Inaction as well as action may be negligence, and interven-tion relates to sequence in time rather than the physical aspects of conduct. The duty of care being established, it applies to conduct of omission as well as of commission in logical conformity with the principle that relationships determine the requirement as well as the standard of care. Required to take into account a known tres-passer's presence, one may not carelessly cause force to be exerted against him either by active or passive conduct.

It is therefore of no legal importance whether the tester's alleged negligence was in starting up the machine or in continuing to run it after he learned of the presence of persons near it. And the in-quiry is whether there is evidence that an ordinary man in his place would have either stopped or started the machine. As he had no actual knowledge and appreciation of danger, the inquiry resolves itself into the question whether there was evidence of a duty to anticipate it.

It was in evidence that the plaintiff was struck by a piece of a broken needle which flew from the machine as the result of the break. Argument that such a conclusion is conjectural disregards the jury's province in accepting and rejecting evidence. If the plaintiff was injured by a fragment of a wire needle, the jury might find that the

tester was mistaken in his testimony that it was another kind of needle that broke, and if the injury was from such other kind of a needle, his testimony was consistent with such a finding.

The needles in normal use were made of soft steel. While their texture and elasticity varied, only a slight variation was to be expected. Their quality made it easy to bend and twist them. As compared with hard steel there was less tension and hence less tendency for a needle to snap and fly when it broke. The needles were set in grooves on the surface of a vertical cylinder the lower part of which was enclosed by a cam cylinder. When the machine was running, the needle cylinder revolved with the needles moving up and down in their grooves and with the projecting butts of the needles at their lower ends striking the cams of the cam cylinder. Needles often broke, usually in their butts in striking the cams, and sometimes in their up and down play in the grooves. In the former way, if not in both ways, it was the application of vertical force that directly caused the break, in its overcoming the static resistance. The surface speed of the needle cylinder when revolving was at a rate less than four miles an hour, and the normal trajectory of a broken fragment would end within two feet of the machine. It would require a tension in the steel of a needle causing a tendency to spring, to give a fragment additional impulse to make it go farther. Such tension would be slight in a needle butt that broke in striking a cam, and would be more when the break was in the shaft of the needle. The plaintiff was struck by a fragment from a broken butt.

As she watched the machine the plaintiff stood facing its back side about four feet from it and in an aisle between two rows of machines and used as the help and others had occasion without reference to the running of the machine. While there was more protection from the flying parts of a broken needle on the front side of the machine where the operator worked, the protection was only partial and was undesigned as a guard. No precautions against injury either to the operator or to persons using the aisle in which the plaintiff stood were ever taken, and machines like the one in question had been in constant use for a number of years.

Aside from the plaintiff's injury there was no evidence of any occurrence of broken needle parts flying for such a distance as the plaintiff stood from the machine. While broken parts would fly, they usually dropped on the bed of the machine or barely flew over its edge to no appreciable distance beyond it. The plaintiff's claim

that parts were likely to fly to any distance is not borne out by the evidence. The most that any witness testified was that he could not tell how far they would fly and that a distance of four feet would be "most unusual."

The operator testified that he had had many years of experience in testing similar machines, was familiar with the details of their construction and operation, had no knowledge of any tendency of the parts of a broken needle to fly beyond the range of the machine itself, and while parts flew, only in closer proximity than his normal position in running the machine had he been struck by them.

While this testimony might be discredited, there was no conflicting evidence from which findings inconsistent with it might be made. The rejection of evidence authorizes no inferences inconsistent with it in the absence of other evidence to support them, and does not supply the need of other evidence therefor. The discredit of the testimony would therefore have only negative force and would leave an absence of evidence from which no inferences might be drawn.

Upon the evidence it cannot be found that the tester was negligent in not foreseeing that a needle of normal quality was likely to break and a part of it fly far enough to hit and injure the plaintiff. There is nothing to show that he knew or should have known of such a tendency. It was no part of his duty or work to provide conditions of safety, and he was not responsible for the layout of the machines with reference thereto. He was not shown to have had any experience or occasion to lead him to think the plaintiff was in danger with the machine running. The evidence showed no flying of broken parts to any appreciable distance beyond the machine, and the calculated limit of two feet would give no reasonable expectation of a distance twice as far for the needles in normal use. While he knew that there was some tension in a needle of normal quality, no reason or occasion for his expecting that on the application of the vertical force a broken piece might fly as far as four feet horizontally is shown.

The injury although resulting from the conduct of intervention does not in itself tend to show that such conduct was negligent. A proximate result and a foreseeable result are distinct issues, and the former does not establish the latter. *Derosier* v. *Company*, 81 N. H. 451, 462, 463. Foresight of what may happen is to be judged, not by what does happen, but by there being a chance of its happening sufficiently serious that men in general in the actor's place would

guard against it. *Tullgren* v. *Company*, 82 N. H. 268, 276, 277. The evidence of such a chance is here lacking.

There being no evidence that the tester should have known of any likelihood of broken parts flying so far and so forcibly as to cause such an injury as the plaintiff received, sufficient to call for protective action on his part in not starting or stopping the machine, there is nothing to show that it would have occurred to an ordinary man in his place that it was dangerous to the plaintiff for him to run the machine. As to his care, "There was no general danger of accident of which the one happening was but one injurious result of many or even several which might have followed." *Dionne* v. *Company*, 76 N. H. 17, 20. Reasonable anticipation called for foresight only of what might be expected, and the tester is not shown to have had such knowledge or information respecting the danger as might be found to call for foresight of such an injury as occurred.

No claim is made that the needle was not of normal quality but the claim is made that with allowance for the expected variation in quality a needle of normal quality might be expected to be brittle enough to fly on breaking with such force as to cause such an injury as occurred, and hence that the injury should have been foreseen. The difficulty with the claim is that there is no evidence that the normal needles were thus brittle. Only a needle harder and more brittle than those in normal use would be expected to produce such a result, and the plaintiff concedes that there is no evidence that such a needle was used. And the waiver of any claim that an over-hard needle was used bars a claim of any duty to take precautions for what might happen from the use of such a needle. *Chesley* v. *Dunklee*, 77 N. H. 263, 265; *Manning* v. *Railway*, 80 N. H. 404, 408. While the defendant's expert testified that the needles were made of "rather a brittle steel," he explained that the steel "would bend considerable first" before it broke, and that on "breaking under any circumstances or conditions" he would not expect a broken part to fly more than two feet horizontally. No fair construction of his testimony authorizes its import as evidence that a normal needle was so brittle that its break would be likely to result in such an injury as the plaintiff received.

Since the defendant is liable only for negligence in the tester's intervention, the lack of evidence of such negligence relieves it from liability. *Judgment for the defendant.*

BRANCH, J., did not sit: the others concurred.