Hillsborough,
Jan. 3, 1939. } No. 2998.

FRANK LAWRENCE, JR. *(by his father and next friend)*

*v.*

TILO ROOFING COMPANY.

FRANK LAWRENCE, SR. *v.* SAME.

*Sullivan & Sullivan (Mr. Thomas E. Dolan* orally), for the plaintiffs.

*Lucier & Dowd (Mr. Lucier* orally), for the defendant.

PAGE, J.    At the time of the accident Frank Lawrence, Jr., who for convenience will be called the plaintiff, was attending the Milford Grammar School.    The defendant was in the midst of repairs upon the roof of the building, but because of rain its men were not present on the day of the accident.    In the prosecution of the work the de-

fendant used a hoisting apparatus which was set upon the flat roof. The boom was a plank of hard wood twelve feet long and two by six inches in diameter. When in place this boom extended about a foot and a half from the face of the building, whose outer wall rose about thirty inches above the roof. The boom did not rest upon this parapet, but upon a triangular horse placed near the wall and made of two by four stock bolted together, with a space in the peak into which the boom fitted upon its narrow edge. The inner end of the boom was sawed at an angle and fastened with two bolts to a two by eight plank six feet long. The angle of sawing was such that the six-foot plank rested flat upon the surface of the roof. This plank was held in place by setting upon it kegs of gravel weighing in all about four hundred pounds. The horse was held in similar manner by about three hundred-weight of filled kegs and roofing material. In the over-hanging end of the boom was a pulley through which passed a rope used for raising material to the roof. Both ends of the rope, about ninety feet long, could reach the ground at the same time, with about two feet to spare. Hence the pulley was at least forty feet above ground.

The night preceding the accident, the defendant's employees tied up the rope so that its ends were twelve or fifteen feet above the ground, and so left them. Their purpose was to keep the rope out of the reach of the school-children. The rope hung between a window and a corner, but how near to the window does not appear.

On the day of the accident the plaintiff returned to school for the afternoon session and attempted to enter a door. As he approached, he noticed some boys playing in the vicinity of the door with the hoisting rope. Asked what they were doing, he said, "Pulling it, I guess. I don't know." As to whether any of them were climbing up the rope, he said, "I think so." Questioned whether they were swinging, he replied, "I'm not quite sure of that." Later he said that he thought he saw some of the boys trying to swing on the rope. He had never before seen anybody playing with the rope.

When he got within about a yard of the door, he felt something hit him; he did not know what. While he testified that some more than fifteen or twenty boys were seen by him to be playing near the door as he approached, no other witness was called to testify as to his movements, to his being hit, or to the events leading up to the accident. The doctor who attended him testified that he found a wound in the dome of the plaintiff's skull about three inches long, exposing the bone.

The morning after the accident, the defendant's employees returned to the job and found on the ground the boom, the horse and two of the kegs used to weigh them down. The horse was cracked, but whether the crack caused the fall or was the result of it is a matter of conjecture. When the apparatus fell is also a matter of conjecture. If it fell at the time of the accident, none of the numerous eye-witnesses was called to say so. The same conjecture applies concerning the immediate cause of the wound. The plaintiff told the doctor, if the doctor understood and remembered correctly, that he was hit by a bucket. The boy told the jury that he did not know what hit him. No other eye-witness testified. There is no evidence that any bucket belonging to the defendant had any part in the accident. The only evidence as to any property of the defendant falling is that already noted, and that is not fixed except as to some time before the next morning. The considerable weight of the boom and horse has already been suggested from their construction. Each keg, with its fill of gravel, weighed about a hundred pounds. It is mere conjecture that any one of these heavy objects fell from a height of more than forty feet and caused the comparatively slight injury.

As to the situation created by the defendant, four possibilities occur to us.

First, is the possibility that the rope was left hanging to the ground, where the boys could play with it unhindered. There is no evidence to sustain this inference. The only evidence was to the contrary. Even if this evidence were disbelieved as coming from the employe of the defendant, the possibility remains merely a possibility and cannot be magnified into a probability.

Second, is the possibility that the rope was tied so insecurely that it fell to the ground of its own weight. Again, though there were numerous witnesses on the spot, there is not the slightest evidence to support this theory, which also is pure guess.

Third, is the possibility apparently favored by the plaintiff, that the rope was left tied up at a height of twelve or fifteen feet from the ground, whence no boy could reach it, but in such close proximity to a window that it could be reached therefrom. The trouble with this theory is that it nowhere appears how near to the window the rope was left hanging. The only evidence is that it was not in front of a window, but "to the left of the window, right close to the corner." The fact did appear that the rope hung about a foot and a half out from the face of the building. Whether, nevertheless, it was so near to the left side of the window that reasonable men would foresee

the likelihood of intermeddling from that quarter, was not shown. Nor did the fact appear that the rope was actually untied by somebody leaning from the window.

Fourth, there was evidence that "the building was so constructed that at a point above the ground there was a slight ledge," and that the rope was tied above this ledge. But there was no evidence that an intermeddler could reach this "slight ledge" from the ground or elsewhere, or that he could stand on it, or that from it he could reach the knot and untie it. Nor was there evidence that the accident was occasioned in any such manner, even if its possibility might have been foreseen.

Since the hoisting apparatus was not in use by the defendant at the time of the accident, it is immaterial whether it was sufficient for the use intended. It was sufficient for the hoisting of two to three hundred pounds. It was probably not sufficient to sustain more than three boys swinging upon the rope at the same time. But as far as appears in the record, there was nothing to charge the defendant with knowledge that the requisite number of boys were likely to get upon the rope or that an innocent non-intermeddler was likely to be injured by something falling, or perchance by his being hit or kicked by an intermeddler swinging or slipping on the rope.

We need not decide whether the defendant had any duty, under any circumstances, to protect the plaintiff against the acts of intermeddlers. Its duty to the intermeddlers themselves depended upon reasonable anticipation of their intermeddling. *Garland* v. *Railroad*, 76 N. H. 556, 567; *McCaffrey* v. *Company*, 80 N. H. 45; *Lambert* v. *Company*, 80 N. H. 126, 128; *Castonguay* v. *Company*, 83 N. H. 1, 6; *Dillon* v. *Company*, 85 N. H. 449. By analogy to the principle just stated and to the general principles of foresight upon which the law of negligence is based, it would seem that the duty of the defendant to the plaintiff, if any, depended upon reasonable anticipation that intervention of intermeddlers might injure the plaintiff.

The relevant circumstances here appearing are insufficient to make such anticipation probable in the mind of a man of average care. Upon the view most favorable to the plaintiff, the immediate cause of the injury was set in motion by the intervention of intermeddlers. The extent of the danger of such intervention depended upon the manner in which the rope was disposed the night before. It is true that the workmen foresaw a chance of intermeddling. With this in mind, they made some disposition of the rope. What the disposition was, with respect to the likelihood of intermeddlers' reaching it from

the window or ledge, is not shown with such definiteness that the jury could say whether or not it was a reasonably prudent one. The burden of proof is not sustained by showing that an injury happened after some disposition of the rope. What is lacking is evidence that the rope was left in such place and manner that men of average foresight would have anticipated danger to any person in the plaintiff's situation.

*Judgments for the defendant.*

BRANCH, J., was absent: the others concurred.