### PUBLIC SERVICE CO. OF NEW HAMPSHIRE v. ELLIOTT et al.

### No. 3684.

Circuit Court of Appeals, First Circuit.

Oct. 30, 1941.

Carl C. Jones, of Concord, N. H. (Demond, Sulloway, Piper & Jones, of Concord, N. H., on the brief), for appellant.

Richard H. Lee, of Boston, Mass., and Robert P. Booth, of Manchester, N. H. (Wyman, Starr, Booth, Wadleigh & Langdell, of Manchester, N. H., on the brief), for appellees.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Carmon M. Elliott, Jr., a minor, brought suit for damages on account of injuries received by him while on a tour of inspection through a substation operated by the defendant, Public Service Company of New Hampshire. His father also sued to recover medical and hospital expenses, and 'for loss of his son's services, resulting from the accident. Jurisdiction in the court below rested on diversity of citizenship. The cases were tried together and resulted in verdicts and judgments for the respective plaintiffs. We have before us the consolidated appeals of the defendant from the two judgments.

The only alleged error relied upon in appellant's statement of points on appeal and in its brief is the trial judge's refusal to grant defendant's motion for a directed verdict in each case at the close of all the evidence. We have, therefore, no occasion to consider the charge to the jury, though the charge is included in the record. If under the governing New Hampshire law as applied to the evidence the plaintiffs were entitled to go to the jury, the judgments must be affirmed.

Since the father's action is dependent upon the right of the son to recover, we shall hereafter refer to the son as the plaintiff.

For many years the defendant had made it a practice to admit to its Brook Street substation in Manchester, New Hampshire, groups of students on inspection trips. Among the schools which had thus been accommodated in the past had been the local high school and the Wentworth Institute, a trade school in Boston, Massachusetts.

At the time of the accident the plaintiff, a boy 19 years old, and six feet one inch tall, was in the second year of a course on electrical construction at Wentworth Institute. The laboratory there contained no high voltage installations but the class had received some theoretical instruction on high tension, and the instructor had warned against the danger of coming in contact with, or in near proximity to, exposed high voltage parts. However, Professor Wilson, one of the instructors, testified: "I don't believe any of these boys appreciated the devastating effect of a high voltage arc. We told them it was dangerous."

On May 13, 1940, the plaintiff and about twenty-five of his classmates, accompanied by three instructors in the school, went to inspect the defendant's electrical substation in Manchester. The trip was required as part of the school's educational program. By prearrangement they were met at the door by defendant's employee Cates, the chief operator of the substation. "We put ourselves in his hands," Wilson testified. Cates escorted the party through the building, explaining the equipment and answering questions. They went first through the main switchboard room, thence by a passageway to the assembly room, and from there through a door, which Cates unlocked, into the high tension room where the accident happened.

Two signs marked "Danger" were visible in the main switchboard room, but there were no danger signs in the assembly room, nor on the door of the high tension room, nor anywhere within the latter room. Cates gave no special warning to the boys, as he led them into this, the most dangerous, room in the substation, nor did the plaintiff receive any warning from his instructors at this time.

The boys congregated in somewhat straggling groups in the aisle of the high tension room.

The plaintiff stood near a current transformer, in a group to which Cates was talking. The cylindrical tank of the transformer rested on a steel stand or support. Mounted on the tank was a porcelain bushing or insulator from the top of which emerged about two inches of an uninsulated copper conductor. Attached to this copper conductor were two copper tubings or bus bars rising vertically to the ceiling, through

which tubings the current is conducted in and out of the transformer. Also attached to the copper conductor at the top of the bushing were two metal brackets extending horizontally for several inches out toward the aisle. These brackets supported an inverted glass jar containing a bypass protector or lightning arrestor. The two terminals under the bypass protector, to which the horizontal brackets were attached, each ended in a brass stud which was alive and uninsulated. These terminal studs, and the other exposed live parts, namely, the copper conductor leading out of the top of the bushing and the horizontal metal brackets, were about seven feet from the floor, well within the reach of a grown man standing in the aisle nearby the current transformer unit.

As previously stated, there was no warning sign on the transformer. Nor had the plaintiff been warned to expect, when he came into the high tension room, that live parts would be found exposed in such dangerous proximity to persons standing in the aisle. Further, a qualified expert put on by the plaintiff testified that according to recognized principles of safety in installing high voltage equipment, unguarded live parts should have a minimum vertical clearance of nine feet six inches above the floor, or "well out of reach" by an inadvertent gesture of the hand. He said that in laying out the installation the stand on which the current transformer rested could have been made higher so as to obtain the desired clearance, without impairing operating efficiency. The defendant sought vigorously to discredit this expert's testimony, but its weight was for the jury.

While Cates was explaining something overhead, one of the boys asked him what the glass jar was. Cates appeared not to hear the question, whereupon the plaintiff said, "He means this," or words to that effect, pointing with his left hand toward the bypass protector. He did not touch anything, but the tip of his finger came within one, two or three inches (as variously testified by eyewitnesses) of the terminal studs under the glass jar. A blinding flash occurred as current jumped from the terminal to the plaintiff's finger. He fell to the floor unconscious and severely injured.

The defendant moved for a directed verdict on the grounds (1) that the plaintiff was guilty of contributory negligence as a matter of law, (2) that there was no evidence on which a jury could reasonably find the defendant negligent, and (3) that the plaintiff was a bare licensee who, under the law of New Hampshire, must take the premises as he found them.

As to the plaintiff's status in the substation we assume it to have been that of a gratuitous licensee whose presence at the time was known to the defendant. This much is conceded by the defendant. So far as the facts of this case are concerned, the result would not be different, under the New Hampshire law, whether the plaintiff were an invitee or business visitor, a gratuitous licensee, or perhaps even a known trespasser.

The defendant as possessor of the premises had a duty of ordinary care, both in respect of active conduct and in respect of the control of dynamic forces which it had already set in motion, to avoid subjecting to unreasonable risk of bodily harm any persons of whose presence it had become aware. In Brown v. Boston & Maine R. R., 73 N.H. 568, 573, 64 A. 194, 196, the court held that "the defendants would be responsible for negligently injuring the deceased through their active intervention, even if she were a trespasser, provided at the time of the accident she was in the exercise of ordinary care, and they knew of her presence in a dangerous situation, or failed to exercise due care to discover her presence in such a situation when circumstances existed which would put a person of average prudence upon inquiry." Accord, Hobbs v. George W. Blanchard & Sons Co., 74 N.H. 116, 120, 65 A. 382, 124 Am.St.Rep. 944; Knowles v. Exeter Mfg. Co., 77 N.H. 268, 269, 90 A. 970; Smith v. Boston & Maine R. R., 87 N.H. 246, 252, 177 A. 729. The extension of this concept of "active intervention" to include an affirmative duty to exercise control over forces already set in motion was urged by Peaslee, J., dissenting, in McCaffrey v. Concord Electric Co., 80 N.H. 45, 54, 55, 114 A. 395, 17 A.L.R. 813, and was recognized as being the law of New Hampshire in Castonguay v. Acme Knitting Machine & Needle Co., 83 N.H. 1, 6, 136 A. 702, and in Dillon v. Twin State Gas & Electric Co., 85 N.H. 449, 452, 163 A. 111. See Am.L.Inst.Torts Restatement, § 302, comments a and b. In the Castonguay case, the court said (83 N.H. at page 6, 136 A. at page 705): "Negative conduct in failing to stop a force in active operation may be as careless towards a

6

trespasser as positive conduct in putting such a force into operation. Not to shut off an electric current in a broken wire about which trespassing children are seen to be playing may be as negligent as to turn on a current under such conditions. Inaction as well as action may be negligence, and intervention relates to sequence in time rather than the physical aspects of conduct. The duty of care being established, it applies to conduct of omission as well as of commission in logical conformity with the principle that relationships determine the requirement as well as the.standard of care. Required to take into account a known trespasser's presence, one may not carelessly cause force to be exerted against him either by active or passive conduct."

The case at bar falls within the principle just stated. At the time the plaintiff and his classmates, to the knowledge of the defendant, entered the dangerous high tension room, defendant had control of a force of high voltage electricity which it was causing to flow through the installations there. Hence defendant came under a duty of care to see that this force inflicted no hurt upon the licensees present—a duty that would call either for shutting off the power, or (as a more practical alternative) giving an adequate warning, if it were reasonably to be anticipated that the visitors might not fully and intelligently understand the dangers lurking in the room. That the law should impose such a duty in the present case is all the more obvious from the fact that defendant's employee Cates led the boys into the high tension room, and thus by his "positive conduct" brought the plaintiff into the zone of danger.

This is not, then, the case of a licensee being injured by a passive condition on the defendant's land. But even if so regarded, the dangerous condition is one of which the defendant was well aware and "the licensee has the right to rely on a warning of risks which he may not, by the exercise of reasonable care, be expected to discover." Hashim v. Chimiklis, 91 N.H. —, 21 A.2d 166, 167, 168. In the absence of such a warning, the licensee does not take "the premises as he finds them." Locke v. Payne, 81 N.H. 266, 267, 124 A. 668.

Since the New Hampshire law is clear, cases from other jurisdictions cited by the defendant need not be discussed. New Hampshire has repudiated the rule, sometimes found in decisions from other states, that the only duty owing to a bare licensee is to refrain from wilful or wanton injury. Knowles v. Exeter Mfg. Co., 77 N.H. 268, 269, 90 A. 970. Liability turns, then, upon questions of fact: (1) Would a reasonable man in Cates' position have led the boys into the high tension room without giving emphatic warning that within easy reach of persons standing in the aisle were live exposed parts deadly not only to the touch but also to the near approach of a hand extended in casual gesture? (2) Was the plaintiff guilty of contributory negligence?

We think both these questions of fact were properly for the jury on the evidence.

As to the evidence of defendant's breach of duty, it is quite true that the power company had no duty to redesign its substation so as to eliminate all risk to visitors, but the fact (as the jury might find) that by the better engineering practice high voltage equipment is not so installed as to leave live exposed parts within reach from the floor, makes it reasonable to infer that an ordinarily careful person in defendant's position would have realized the risk of injury to unsuspecting visitors and hence before admitting the boys to the high tension room would have given most explicit warning of the dangers to be encountered there.

On the issue of contributory negligence we cannot say that the trial judge was in error in concluding that a reasonable jury might find the plaintiff free from contributory negligence. It may be that the plaintiff knew more than the ordinary uninstructed layman about the properties of electricity; hence the plaintiff's conduct must be judged in the light of that superior knowledge. Torts Restatement, § 289, and comment n. But while the plaintiff may have had some theoretical instruction on the destructive force of high voltage electricity, the jury might conclude, not unreasonably, that an ordinary prudent man in the plaintiff's position would not have been on the lookout for exposed parts so close to the aisle, especially in the absence of any warning signs in the high tension room and in the absence of any cautionary remarks by the chief operator as he led the visitors into the room.

Perhaps the plaintiff, if he had focused his attention on the construction

of the current transformer, might, with the knowledge he had, have come to a realization that he was in dangerous proximity to unguarded parts above the bushing. But the "reasonable man," that standardized man to whose assumed conduct in like circumstances the plaintiff's conduct must conform, is not altogether devoid of human frailties. This "reasonable man" may, for instance, make an error of judgment in an emergency. Folsom v. Concord & Montreal R. R., 68 N.H. 454, 461, 38 A. 209; Carney v. Concord Street Ry., 72 N.H. 364, 372, 57 A. 218. See Torts Restatement, § 296. So, too, his standardized mind may be inadvertent to conditions indicative of danger, where adequate diverting circumstances are present. Kane v. Northern Central Ry., 128 U.S. 91, 96, 9 S.Ct. 16, 32 L.Ed. 339; Madison v. Antigo, 153 Wis. 448, 141 N.W. 287; Myers v. City of New York, 154 App.Div. 713, 139 N.Y.S. 432. On the facts of the case at bar we cannot say that the plaintiff was guilty of contributory negligence as a matter of law in failing to direct his attention to a careful study of the details of the current transformer unit before making the spontaneous and wholly natural gesture of pointing toward the glass jar mounted on top of it. See Detroit Edison Co. v. Ewing, 6 Cir., 122 F.2d 852, decided October 6, 1941.

In each case the judgment of the District Court is affirmed, with costs to the appellee.