Carroll
No. 83-160

ARNOLDO M. SICILIANO *& a.*

v.

CAPITOL CITY SHOWS, INC. d/b/a MARC'S AMUSEMENTS, INC. *& a.*

JOHN J. SANTUCCIO *& a.*

v.

CAPITOL CITY SHOWS, INC. d/b/a MARC'S AMUSEMENTS, INC. *& a.*

April 9, 1984

720

722

*Law Offices of James J. Kalled,* of Ossipee (*James B. Kazan* on the brief and orally), for the plaintiffs.

*Wiggin & Nourie,* of Manchester (*Wilfred J. Desmarais, Jr.,* and *Alan R. Kusinitz* on the brief, and *Mr. Desmarais* orally), for the defendant Capitol City Shows, Inc. d/b/a Marc's Amusements, Inc.

*Law Offices of Augustine J. McDonough,* of Manchester, for the defendant Empire Fire and Marine Insurance Company, adopted the position taken in the brief of Capitol City Shows, Inc.

BATCHELDER, J. The plaintiffs appeal from a decision of the superior court which dismissed their actions claiming damages for the parental loss of a child's society, and their actions alleging strict liability against the defendant Capitol City Shows, Inc. We affirm.

These actions arose from an amusement ride accident which occurred on July 1, 1981, at a carnival in North Conway. The defendant Capitol City Shows, Inc. was the amusement ride operator, the defendant Empire Fire and Marine Insurance Company was the insurer of the ride, and the defendant Richard Tracy allegedly inspected the ride prior to the accident. As a result of the accident, Veronica Siciliano, a minor, sustained cerebral injury and Lisa Santuccio, also a minor, died.

Arnoldo Siciliano, as the father and next friend of Veronica Siciliano, and John Santuccio, as administrator of the estate of Lisa Santuccio, initiated actions seeking damages from all the defendants on the ground of negligence and against Capitol City Shows, Inc. on the additional ground of strict liability. Also, the parents of each minor child initiated their own lawsuit against all the defendants, claiming damages for the loss of society of the respective children.

The Superior Court (*Wyman,* J.), upon the recommendation of the Master (*Charles T. Gallagher,* Esq.), dismissed the strict liability counts against Capitol City Shows, Inc. Additionally, the court dismissed the counts seeking recovery by the Santuccios for the loss of society of their daughter and denied the Sicilianos' motion to amend their complaint to recover for the loss of society of their daughter. The dismissals were based on the plaintiffs' failure to state causes of action.

The plaintiffs first ask this court to create a cause of action for parental loss of society of a minor child injured or killed as a result of negligent conduct. They argue that recognition of such a cause of

action is a natural extension of common law and will reaffirm this State's proclaimed interest in the preservation of the family relationship.

In the abstract, the plaintiffs' claim carries enormous sympathetic appeal. No one can deny the loss a parent must feel when deprived, even temporarily, of the comfort and companionship of a child. Indeed, this court has recognized the importance of maintaining the integrity of the family relationship. *See, e.g., State v. Robert H.*_____, 118 N.H. 713, 715–16, 393 A.2d 1387, 1388–89 (1978). However, not every "foreseeable injury to a legally recognized relationship necessarily postulates a cause of action . . . ." *Borer v. American Airlines, Inc.,* 138 Cal. Rptr. 302, 305, 19 Cal. 3d 441, 446, 563 P.2d 858, 861 (1977).

 In New Hampshire, two common-law causes of action arise when a minor child is injured by the negligent act of another: one by the child for personal injuries; another by a parent for pecuniary damages, such as loss of services and expenses caused by the injury to the child. *Heath v. Seymour,* 110 N.H. 425, 429, 270 A.2d 602, 605 (1970). A parent may recover for the loss of a child's services because he or she is entitled to the services of a minor child. *Beaudoin v. Beaudoin,* 118 N.H. 325, 327, 386 A.2d 1261, 1263 (1978). This parental right grows out of the obligation of the parent to support and educate the child and is contingent upon the parent actually retaining custody of and supporting the child. *Lessard v. Company,* 83 N.H. 576, 578, 145 A. 782, 784 (1929); *Hillsborough v. Deering,* 4 N.H. 86, 95 (1827); *see Hammond v. Corbett,* 50 N.H. 501, 505, 507–08 (1871). This parental right has been compared to the right of a master to recover against anyone who interferes with the master-servant relationship. *See Whitaker v. Warren,* 60 N.H. 20, 26 (1880); *see also Sargent v. Mathewson,* 38 N.H. 54, 57–58 (1859); *Campbell v. Cooper,* 34 N.H. 49, 68 (1856) (both cases involve enticing and harboring plaintiff's servant); *Davidson v. Goodall,* 18 N.H. 423, 426 (1846) (seduction of plaintiff's servant).

 Therefore, at common law, based on the parental obligation to maintain a child, a parent could recover for pecuniary losses incurred as a result of a negligently inflicted injury to that child. A parent was not entitled to recover for his or her independent or intangible injuries resulting from the negligent injury to a child. *See Courage v. Carleton,* 96 N.H. 348, 350, 77 A.2d 111, 113 (1950). Thus, the common-law cause of action for loss of a child's services does not argue for the expansion of liability flowing from a single tortious act.

Generally, at common law,

> "negligence as a legal source of liability gives rise only to an obligation to compensate the person immediately injured, not anyone who predictably suffers loss in consequence of that injury, unless liability for that person's consequential loss has a legal source besides its foreseeability."

*Norwest v. Presbyterian Intercommunity Hosp.*, 652 P.2d 318, 333 (Or. 1982). In this case, we are asked to extend the liability of a negligent tortfeasor to cover harm to a plaintiff which occurs as a consequence of an injury to a third party, when that harm is emotional and unrelated to any injury to the plaintiff's physical person or tangible property.

■ The determination whether so to extend liability arising from a single tortious act must be based on public policy considerations, with reference to judicial and statutory precedent. *See Corso v. Merrill*, 119 N.H. 647, 654, 406 A.2d 300, 304–05 (1979); *see also Baxter v. Superior Court of Los Angeles Cty.*, 138 Cal. Rptr. 315, 317, 19 Cal. 3d 461, 464, 563 P.2d 871, 873 (1977); *DeAngelis v. Lutheran Medical Center*, 58 N.Y.2d 1053, 1055, 462 N.Y.S.2d 626, 627–28, 449 N.E.2d 406, 407–08 (1983).

■ Compelling public policy reasons militate against this court's recognizing a cause of action allowing parents to recover for loss of a child's society. Loss of a child's society is an intangible, nonpecuniary loss which can never properly be compensated by money damages. The emotional nature of the loss makes defining and quantifying damages difficult, which may lead to disproportionate awards. We also note the probability of increased litigation and multiple claims, which will hinder settlements and increase expenses. *See Curtis v. County of Cook*, 109 Ill. App. 3d 400, 409, 440 N.E.2d 942, 948 (1982); *Baxter v. Superior Court of Los Angeles Cty. supra.* "Additionally, the social burden of providing damages for this loss will ultimately be borne by the public through increased insurance premiums or in the enhanced danger that accrues from the greater number of people who will choose to go without insurance." *Koskela v. Martin*, 91 Ill. App. 3d 568, 572, 414 N.E.2d 1148, 1151 (1980); *Borer v. American Airlines, Inc.*, 138 Cal. Rptr. 302, 306, 19 Cal. 3d 441, 447, 563 P.2d 858, 862 (1977).

However, this court has allowed recovery for some intangible losses suffered by the secondary victim. Therefore, it is necessary to examine those cases to determine if they support the recognition of a new cause of action regardless of public policy reasons against such a result.

An action for loss of spousal consortium during the survival of the injured spouse may be compared to the action the plaintiffs urge us to recognize. In New Hampshire, a husband had a common-law cause of action for loss of consortium caused by injuries inflicted upon his wife. *Guevin v. Railway*, 78 N.H. 289, 296, 99 A. 298, 302 (1916). The term "consortium" was used to describe the husband's marital rights and included three elements—services, society and sexual rights. *Id.* at 294, 99 A. at 301. Because the cause of action was based on the marital relationship and not on a master-servant relationship, the husband could recover for loss of impairment to any element; it was not necessary for the husband first to prove loss of services in order to recover. *Id.* at 295, 99 A. at 302.

At common law, a wife had no marital rights and thus, in *Snodgrass v. Cherry-Burrell Co.*, 103 N.H. 56, 164 A.2d 579 (1964), we held that she could not recover for negligent injury to the marital relationship. It was the *legislature* in 1967 which, seeking to provide equality between the sexes, conferred upon a wife the right to recover damages for loss or impairment of consortium. RSA 507:8-a; N.H.S. JOUR. 626 (1967).

Significant distinctions may be drawn between loss of marital consortium and loss of a child's society. First, many courts have been more willing to protect the relationship between husband and wife than that between parent and child. *Brennan v. Biber*, 93 N.J. Super. 351, 367, 225 A.2d 742, 751 (1966), *aff'd*, 99 N.J. Super. 247, 239 A.2d 261 (1968). Second, loss of marital consortium includes impairment of the sexual life of a married couple, which is not an element of the parent-child relationship. *Guevin v. Railway supra; see also Koskela v. Martin*, 91 Ill. App. 3d 568, 572, 414 N.E.2d 1148, 1151 (1980); *Borer v. American Airlines, Inc.*, 138 Cal. Rptr. 302, 307, 19 Cal. 3d 441, 448, 563 P.2d 858, 863 (1977).

Our reasoning and holding in *Corso v. Merrill*, 119 N.H. 647, 406 A.2d 300 (1979), which we reaffirm today, also may be compared to the present case. In *Corso*, this court, based on traditional negligence principles, expanded recovery in actions based on negligent infliction of emotional distress to plaintiffs outside the zone of danger. *Id.* at 659, 406 A.2d at 308. We recognized that freedom from mental distress is an interest worthy of legal protection. Yet, before allowing recovery, this court examined public policy concerns of unlimited and burdensome liability and balanced these concerns against the interests of the plaintiff. *Id.* at 654, 406 A.2d at 305.

In *Corso*, we determined, based on California's experience, that the expansion of recovery to plaintiffs outside the zone of danger would not lead to unlimited liability if well-defined foreseeability factors were adopted. *Id.* at 656, 406 A.2d at 306. These well-defined foreseeability factors include proximity of time, location and relationship, and allow recovery only to parents whose emotional distress results from a direct emotional impact upon them through their sensory perceptions contemporaneous with the accident. In the case before us, there are no such well-defined limiting factors. Additionally, the plaintiff in an action for negligent infliction of emotional distress must manifest physical symptoms, *id.*, making damages easier to assess than when an injury is purely intangible, as in the instant cases.

In *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983), this court recognized intentional interference with parental custody as a new cause of action, and allowed compensation for the loss of a child's services and care, comfort and companionship. However, *Plante* is distinguishable from this case.

The cause of action recognized in *Plante* is based on an *intentional* tort, and greater responsibility as to the consequences and damages is traditionally imposed on an individual who intended his or her conduct to do harm. *See* W. PROSSER, LAW OF TORTS § 7 (4th ed. 1971); *Derosier v. Company*, 81 N.H. 451, 463, 130 A. 145, 152 (1925) ("In determining how far the law will trace causation and afford a remedy, the facts as to the defendant's intent are often taken into account"); *see also Hogan v. Robert H. Irwin Motors, Inc.*, 121 N.H. 737, 742, 433 A.2d 1322, 1326 (1981) (in awarding damages in an action for malicious prosecution, the jury may take into account the anxiety and injury to feelings and reputation of the plaintiff); *Lunt v. Philbrick*, 59 N.H. 59, 60 (1879) (in the intentional tort of seduction of plaintiff's daughter, plaintiff may recover for all natural and necessary consequences, including injury to wounded and mortified feelings on account of family disgrace).

Additionally, the tortious conduct alleged in *Plante* involved a deliberate interference with the family relationship and, thus, is a direct injury to the parent and his or her rights, rather than an injury to a secondary victim as in the instant case. Finally, the policy concerns in *Plante* weigh differently. The cause of action for intentional interference with parental custody involves a "relatively unusual tort that presents no danger of multiplication of claims or damages. [It], moreover, may serve to deter child stealing and similar antisocial conduct." *Borer v. American Airlines, Inc.*, 138 Cal. Rptr. 302, 309 n.3, 19 Cal. 3d 441, 451 n.3, 563 P.2d 858, 865 n.3 (1977).

We must consider also the policy of this State in compensating victims and their families for negligent infliction of injuries resulting in death. We begin our inquiry by noting that in thirty-five States, parents may recover in a wrongful death action for the loss of companionship and society of a child. *See Sanchez v. Schindler*, 651 S.W.2d 249, 252–53 (Tex. 1983). In fourteen of these jurisdictions, the judiciary has allowed recovery under statutes which traditionally had been interpreted as limiting recovery to pecuniary loss. *Id.* In the other twenty-one States, legislative enactments explicitly allow recovery; nine of these States amended their statutes after judicial interpretation of the existing statute permitted recovery for loss of society and companionship. *Id.*

However, the wrongful death statutes enacted in those thirty-five jurisdictions are the "loss-to-survivors" types, and damages are awarded based on the losses suffered by the victim's survivors. *See* S. SPEISER, RECOVERY FOR WRONGFUL DEATH § 3.1 (2d ed. 1975). By contrast, the New Hampshire legislature has enacted a statute which limits damages to the injuries suffered by the decedent and his or her estate. RSA 556:12. Damages are not assessed based on the loss suffered by surviving relatives. *Carney v. Railway*, 72 N.H. 364, 376, 57 A. 218, 224 (1903).

Thus, judicial and statutory precedent do not support an extension of liability in the instant case. In addition, public policy concerns weigh against expanding the scope of liability flowing from a single tortious act. Therefore, we decline to create a new cause of action allowing parents to recover for the loss of the society of their negligently injured or killed child.

Also, the great majority of jurisdictions have declined to expand their common-law cause of action for parental loss of services to include loss of society. *See generally* Annot., 69 A.L.R.3d 553 (1976); Love, *Tortious Interference with the Parent-Child Relationship: Loss of an Injured Person's Society and Companionship*, 51 IND. L.J. 590 (1976). Of the ten jurisdictions in which the courts have explicitly answered this question, nine have declined to expand the existing parental cause of action or create a new cause of action. *See Baxter v. Superior Court of Los Angeles Cty.*, 138 Cal. Rptr. 315, 19 Cal. 3d 461, 563 P.2d 871 (1977); *Curtis v. County of Cook*, 109 Ill. App. 3d 400, 440 N.E.2d 942 (1982); *Butler v. Chrestman*, 264 So. 2d 812 (Miss. 1972); *Brennan v. Biber*, 93 N.J. Super. 351, 225 A.2d 742 (1966), *aff'd*, 99 N.J. Super. 247, 239 A.2d 261 (1968); *Wilson v. Galt*, 100 N.M. 227, 668 P.2d 1104 (1983); *Gilbert v. Stanton Brewery, Inc.*, 295 N.Y. 270, 67 N.E.2d 155 (1946); *Kalsow v. Grob*, 61 N.D. 119, 237 N.W. 848 (1931); *Quinn v. Pittsburgh*, 243 Pa. 521, 90 A. 353

(1914); *McGarr v. Nat. and Prov. Worsted Mills*, 24 R.I. 447, 53 A. 320 (1902); *but see Shockley v. Prier*, 66 Wis. 2d 394, 225 N.W.2d 495 (1975) (parent may maintain action for loss of aid, comfort, society and companionship of an injured minor child against a negligent tortfeasor).

In the jurisdictions where the right of the parent to recover for negligent injuries to a child is statutory, three jurisdictions allow recovery for loss of a child's society. *See* IDAHO CODE § 5-310 (1979) (interpreted in *Hayward v. Yost*, 72 Idaho 415, 242 P.2d 971 (1952) to include loss of protection, comfort, society and companionship); IOWA R. CIV. P. 8 (1983) (parent may sue for actual loss of services, companionship and society; amended to reflect the holding of *Wardlow v. City of Keokuk*, 190 N.W.2d 439 (Iowa 1971)); WASH. REV. CODE 4.24.010 (1983) (action for damages for loss of services, support, love and companionship, and injury to or destruction of the child-parent relationship; amended to reflect the holding of *Lockhart v. Besel*, 71 Wash. 2d 112, 426 P.2d 605 (1967)); *but see Smith v. Richardson*, 277 Ala. 389, 171 So. 2d 96 (1965) (ALA. CODE § 6-5-390 (Supp. 1983) does not include recovery for loss of child's society).

Therefore, of the jurisdictions which have squarely met this issue, ten deny recovery for loss of a child's society and four allow recovery. The other jurisdictions continue to allow recovery only for pecuniary losses in an action by parents for negligent injury to a child. *But see Drayton v. Jiffee Chemical Corp.*, 395 F. Supp. 1081, 1097 (N.D. Ohio 1975) (by implication allowing recovery); *Deems v. Western Md. Ry. Co.*, 247 Md. 95, 114, 231 A.2d 514, 525 (1967) (in *dictum*, denying recovery); *Bias v. Ausbury*, 369 Mich. 378, 380, 120 N.W.2d 233, 234–35 (1963) (Ohio law; by implication allowing recovery); *Mich. Sanatorium v. Neal*, 194 N.C. 401, 403, 139 S.E. 841, 842 (1927) (by implication denying recovery); *but see also Yordon v. Savage*, 279 So. 2d 844, 846 (Fla. 1973) (by implication allowing recovery) and *City Stores Co. v. Langer*, 308 So. 2d 621, 622 (Fla. App. 1975) (by implication denying recovery) (both cases citing *Wilkie v. Roberts*, 91 Fla. 1064, 1069, 109 So. 225, 227 (1926) (father can recover only his pecuniary losses—services, medical expenses)).

Turning to the second issue, the plaintiffs argue that the defendant Capitol City Shows, Inc. should be held strictly liable for any damages since Capitol City Shows, Inc. supplies a product to the general public which may endanger the public safety. The master dismissed the complaint in strict liability on the basis of *Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 374 A.2d 1187 (1977), which held that, because the operation of a ski tramway involved a nearly pure service transaction, the operator was not liable under strict liability.

■■ The general rule is that the owner and operator of an amusement ride has a duty to exercise reasonable care. The owner or proprietor of a place of public amusement is not an insurer of the safety of the patrons; rather, he must exercise that degree of care which, under the same or similar circumstances, would be exercised by an ordinarily careful or prudent individual. Such care must be proportionate to the danger known or reasonably apprehended and commensurate with the circumstances and risks of the situation. *E.g.*, *Hook v. Lakeside Park Co.*, 351 P.2d 261, 264–65 (Colo. 1960).

Notwithstanding this basic rule, the plaintiffs argue that New Hampshire's doctrine of products liability applies to the present situation and subjects the defendant Capitol City Shows, Inc. to strict liability. The plaintiffs maintain that the defendant, by supplying amusement rides to the general public, is engaged in full-scale commerce.

■ It is necessary, however, to distinguish clearly between products and services. New Hampshire's doctrine of products liability applies to persons engaged in the business of selling *products* for use or consumption. *Buttrick v. Lessard*, 110 N.H. 36, 260 A.2d 111 (1969). The defendant Capitol City Shows, Inc. does not sell or supply a product. It provides persons with a service; namely, a ride on a machine. The passenger is a licensee, with no property rights in the ride.

*Perfection Paint and Color Company v. Konduris*, 258 N.E.2d 681 (Ind. App. 1970), upon which the plaintiff relies, is not persuasive authority because the defendant therein supplied the plaintiff with a product (lacquer reducer), not with a service.

■ We hold that the master correctly relied on *Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 374 A.2d 1187 (1977), in denying the plaintiffs' claim. In *Bolduc*, we affirmed the general rule that strict liability does not apply to a supplier of services. *Id.* at 569, 374 A.2d at 1189. As in *Bolduc*, the defendant here provided a service, not a product.

■■ As we have noted before, we are not prone to extend strict liability in this jurisdiction. *Id.* at 569, 374 A.2d at 1190; *cf. Moulton v. Groveton Papers Co.*, 112 N.H. 50, 54, 289 A.2d 68, 72 (1972). There is no indication that the plaintiffs suffer an unfair burden from the doctrine of strict liability not being applied in this case. The plaintiffs possess adequate protection through an action for negligence. We affirm the superior court's decision dismissing the plaintiffs' claim of strict liability against Capitol City Shows, Inc.

*Affirmed.*

DOUGLAS, J., dissented; the others concurred.

DOUGLAS, J., dissenting: The court today chooses not to recognize the right of parents to recover for the loss of society when a child is negligently killed or severely injured. This decision is based on anachronistic concepts from which the majority cannot free itself to examine present-day norms. In my opinion, a parent's loss of society when a child is negligently killed or severely injured is a cognizable injury for which justice demands compensation. A child is no longer property or an economic unit in the eyes of the law.

The pleadings in this case allege that on July 1, 1981, the plaintiffs' young daughters entrusted themselves to the owners and operators of the "Octopus" ride. The events that followed can only serve to exacerbate the fears that the cautious experience when witnessing the gyrations of one of these rides. The arm of the "Octopus" attached to the girls' car broke, and they fell to the ground. Lisa Santuccio was killed and Veronica Siciliano was seriously injured. The plaintiffs have alleged negligence in the operation, repair, and inspection of the "Octopus" ride. They claim that the ride had been in operation in excess of thirty years without adequate maintenance and that the repairs made to it were faulty. The Trial Court (*Wyman,* J.) upheld the master's order dismissing the parents' action for loss of society for failure to state a claim for relief cognizable under New Hampshire jurisprudence.

Historically, the common law has provided, in this and many other jurisdictions, that parents have a compensable injury when deprived of the services of their children. "It has long been the established law in this State that parents are entitled to the earnings and services of their unemancipated minor children." *Beaudoin v. Beaudoin,* 118 N.H. 325, 327, 386 A.2d 1261, 1263 (1978); *see Lessard v. Company,* 83 N.H. 576, 578, 145 A. 782, 784 (1929); *Hillsborough v. Deering,* 4 N.H. 86 (1827).

The parents' right to a child's services has its legal origins in the old master-servant theory. *See Shockley v. Prier,* 66 Wis. 2d 394, 400, 225 N.W.2d 495, 499 (1975); *see also Ferriter v. Daniel O'Connel's Sons, Inc.,* 413 N.E.2d 690, 692 (Mass. 1980) ("A father has traditionally had actions for abduction and seduction of his child . . . founded upon an analogy with a master's action for enticement of his servant."). This right is not absolute and is correlative to the parents' duty to support the child. *Beaudoin v. Beaudoin, supra* at 327, 386 A.2d at 1263. The right to a child's services was, however, extinguished on the child's death. *Chaloux v. Company,* 75 N.H. 281, 285, 73 A. 301, 303 (1909). Because the cause of action was based on these economic theories, the pecuniary loss computation that courts

still perform might have been appropriate at one time. Today, however, the pecuniary loss computation is an antiquated procedure and the rule is in need of modernization. A child is simply not property.

The origins of the pecuniary loss limitation "are rooted in Charles Dickens' England," *Dawson v. Hill & Hill Truck Lines*, 671 P.2d 589, 592 (Mont. 1983), "an era when ample work could be found for the agile bodies and nimble fingers of small children." *Wycko v. Gnodtke*, 361 Mich. 331, 335, 105 N.W.2d 118, 120 (1960). The damages in these actions were limited to pecuniary loss because "children during minority were generally regarded as an economic asset to parents." *Selders v. Armentrout*, 190 Neb. 275, 278, 207 N.W.2d 686, 688 (1973). During this time, children began working on the family farm or appeared at the minehead or factory gate as early as age 10. *Id.*

> ". . . [T]he restrictive pecuniary loss rule is based on an antiquated concept of the child as an economic asset, stemming from the Dickensian era of brutal child labor . . . when the 'dark Satanic mills' of the nascent industrial revolution disfigured the English landscape. 'The golf links lie so near the mill that almost every day the little children hard at work look out on the men at play.'"

26 A.T.L.A. L. REP. 196 (June 1983) (quoting the famous advertisement of the International Ladies' Garment Workers Union) (citing *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983)). Higher education was a privilege not shared among the general populace. *See Selders v. Armentrout supra.* These are not the realities of today's society.

The concept of a parent's right to recover for a child's lost services was created by the judiciary and, therefore, we may reconsider it. When determining whether to abrogate the doctrine of parental immunity, we held that "it is the responsibility of the judiciary to examine this court-made rule and to make such alterations as the interests of justice may require even though the legislature has chosen not to change it, as was their privilege." *Dean v. Smith*, 106 N.H. 314, 317, 211 A.2d 410, 412–13 (1965); *see Briere v. Briere*, 107 N.H. 432, 434, 224 A.2d 588, 590 (1966); *see also Wycko v. Gnodtke*, 361 Mich. 331, 338, 105 N.W.2d 118, 121–22 (1960) ("a legislature legislates by legislating, not by doing nothing"); *Ferriter v. Daniel O'Connel's Sons, Inc.*, 413 N.E.2d 690, 695 (Mass. 1980) (children have a cause of action for loss of parents' society despite legislative silence); *Schokley v. Prier*, 66 Wis. 2d 394, 397, 225 N.W.2d 495, 497 (1975) ("it is as much our responsibility, as the legislature's, to make changes in the law, if the common-law rule no longer fits the social realities of the present day").

The action for the loss of a child's services based solely on pecuniary loss is an outdated concept that has been widely criticized by scholarly authority. "It is not surprising that the pecuniary rule, at least as it requires a computation of 'child-labor' wages, has been condemned as barbaric and defended principally with silence." Finkelstein, Pickrell & Glasser, *The Death of Children: A NonParametric Statistical Analysis of Compensation for Anguish*, 74 COLUM. L. REV. 884, 884 (1974). The pecuniary-loss concept requires that juries attempt to estimate the value of the child's services and then subtract the cost of their support. *Id.; see Selders v. Armentrout*, 190 Neb. 275, 280, 207 N.W.2d 686, 689 (1973); *see also* W. PROSSER, J. WADE & V. SCHWARTZ, CASES AND MATERIALS ON TORTS, 579–80 n.1 (6th ed. 1976). This approach is utterly without merit today because "if the rule is literally followed, the average child would have a negative worth." *Selders v. Armentrout, supra* at 279, 207 N.W.2d at 689; *see Sanchez v. Schindler*, 651 S.W.2d 249, 251 (Tex. 1983).

> "Justice Spears gives both light and answer when he acutely observes that, under the traditional child-labor formula for measuring damages for the death of a child (wages minus upkeep), the average child would' have a negative worth if the formula were literally followed. 'Strict adherence to the pecuniary loss rule could lead to the negligent tortfeasor being rewarded for having saved the parents the cost and expense of rearing a child.' As wryly stated in a leading casebook on Torts, 'If the pecuniary-loss standard were strictly applied, defendant in a wrongful death case involving a child might counterclaim against the parents for a *quantum meruit* recovery.' Prosser, Wade & Schwartz, Cases and Materials on Torts 580 (Foundation Press, 7th ed. 1982)."

26 A.T.L.A. L. REP. 194, 196 (June 1983) (quoting *Sanchez v. Schindler, supra* at 251).

Three years ago this court recognized that the estimated cost of raising a child was between $69,232 and $85,088. *Park v. Rockwell Int'l Corp.*, 121 N.H. 894, 899, 436 A.2d 1136, 1139 (1981). Other sources have placed the cost much higher. *See* Tuhy, *What Price Children?* MONEY, March 1983, at 77 ($81,000 to $117,000); *Computing the Cost of Kids*, BUS. WK., August 30, 1982, at 80 ($323,000 to $344,000). No court can seriously contend that any child today has an earning capacity that even approaches the lowest of these figures. Most children do not work at all, and the majority of working minors receive little more than the minimum wage and can only work part-time due to educational demands. It does not take an

advanced degree in economics to see that it costs much more to raise a child than a child could ever earn during his or her minority. (*But see* Michael Jackson.)

Several jurisdictions have recently reconsidered this concept and determined that the parents' recovery should not be limited to pecuniary losses; that the loss of a child's society is compensable. In *Sanchez v. Schindler supra*, the Supreme Court of Texas recognized that "by statute or judicial decision, *thirty-five* states allow recovery for loss of companionship and society in a wrongful death action brought by the parents." (Emphasis added.) *Sanchez*, 651 S.W.2d at 252; *see Miller v. Subia*, 514 P.2d 79 (Colo. Ct. App. 1973); *Volk v. Baldazo*, 103 Idaho 570, 651 P.2d 11 (1982); *Elliot v. Willis*, 89 Ill. App. 3d 1144, 412 N.E.2d 638 (1980); *Wardlow v. City of Keokuk*, 190 N.W.2d 439 (Iowa 1971); *Wycko v. Gnodtke*, 361 Mich. 331, 105 N.W.2d 118 (1960); *Fussner v. Andert*, 261 Minn. 347, 113 N.W.2d 355 (1961); *Dawson v. Hill & Hill Truck Lines*, 671 P.2d 589 (Mont. 1983); *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686 (1973); *Anderson v. Lale*, 88 S.D. 111, 216 N.W.2d 152 (1974); *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983); *Lockhart v. Besel*, 71 Wash. 2d 112, 426 P.2d 605 (1967); *Schockley v. Prier*, 66 Wis. 2d 394, 225 N.W.2d 495 (1975).

In the cases that permit a parent to recover for the loss of a child's society, the courts have not satisfactorily articulated the rationale underlying their theory. The courts have simply discussed the antiquated pecuniary-loss rule and concluded, usually based on their wrongful death statutes, that the parents have suffered a loss for which they should be compensated. The courts have, however, failed to discuss fully the real changes that have occurred within our society that now make the loss of a child's society a compensable loss.

Recently, this court reaffirmed its position that parental rights are fundamental rights under the New Hampshire Constitution. *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983); *see State v. Akers*, 119 N.H. 161, 163, 400 A.2d 38, 40 (1979) ("Parenthood lies at the very foundation of our civilization."). In doing so, the court recognized that there is a "sanctity in the union of parent and child that transcends economics and deserves the utmost respect." *Plante v. Engel supra*. The "respect" that the court accorded the parent in *Plante* was full compensation, including expenses and damages for loss of companionship, for the intentional tort of interference with custody. *Id.* I fail to see how this court can refuse to recognize the parents' loss when the child is injured or killed yet permit recovery in a situation where the child was unharmed, as was done in *Plante*.

Historically, couples had children for two basic reasons: because they were needed to assist with the farm or other labor; and because they "just happened." Today, the decision whether to have a child is usually a conscious one, seriously undertaken, and the result of much thought and planning. In fact, the decision-making so perplexes some couples that they seek professional advice in the form of counseling or group workshops. *See* Tuhy, *What Price Children?* MONEY, March 1983, at 77.

When the modern couple does decide to have a child, their reasoning is far different from that of the economic considerations of their forefathers. Some common reasons couples choose to have children are the desire: to enrich their lives; to bring joy and a sense of meaning into their marriage; to share their love and affection; and to perpetuate themselves and their family name.

The decision to have a child then gives way to the exigencies of pregnancy and birth. The distress and discomfort the expectant mother experiences for nine months, along with the agony of labor and birth, are only the beginning of parental sacrifice. The arrival of an infant in the home, the many late night feedings, countless diaper changes, and constant worry require a great deal of patience and self-sacrifice by the parents.

As the child grows, so does its needs; the time and effort spent teaching the child to walk and talk are just preliminary to the school years and the onset of new needs. The self-denial and dedication required of a parent to keep a growing child fed and clothed are substantial, in the face of the current cost of such commodities. In today's society, to raise a child properly, the average parent must surrender many personal luxuries and make an incalculable emotional commitment.

Today's attentive parent does much more than comply with the common-law duty to support a child that gave rise to the parent's right to the child's services. *See Beaudoin v. Beaudoin*, 118 N.H. 325, 327, 386 A.2d 1261, 1263 (1978). Parents today make innumerable sacrifices for their children and simply desire the children's love, respect, and companionship in return. These sacrifices by the parents are like investments that earn the child's love and companionship as "interest." When parents are deprived of this "interest," they suffer a very real loss.

Although parents' losses could never be fully enumerated, reference to but a few is illustrative of the loss they suffer when deprived of a child's society: the joy in watching a child take his first steps or utter his first words; the thrill in seeing a son score a touchdown or a daughter perform a ballet; the pride in watching a child graduate from high school, college, or medical school; and the comfort from a

Sunday visit and the holidays filled with the cheer that children and grandchildren bring. These simple joys and the millions of other interpersonal interactions that parents and their children share are the essence of life, without which the quality of a parent's life is greatly reduced.

Only three years ago, this court recognized one of the most tangible losses parents may suffer when deprived of their child's society. We stated that "while parents may not usually be financially 'dependent' on their young children, there may well come a time due to both the vicissitudes of life and the natural process of aging when parents may become as dependent on the resources of their children as their children were on theirs in earlier years." *Park v. Rockwell Int'l Corp.*, 121 N.H. 894, 899–900, 436 A.2d 1136, 1139 (1981). In December 1983, we recognized that a parent suffers a compensable loss of companionship when deprived of a child through wrongful interference with custody and stated that the parent/child relationship "deserves the utmost respect." *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983). The "respect" we accorded the aggrieved parent in *Plante* was full compensation for the lost companionship. *Id.*

Clearly, money damages can never fully compensate a parent for the losses sustained when a child is killed or seriously injured, but this should not stop us from permitting recovery. "We are aware, of course, that there are those who say that the life of a human being is impossible to value . . . [and that therefore we should] assign it no value whatever. This kind of delicacy would prevent the distribution of food to the starving because the sight of hunger is so sickening." *Wycko v. Gnodtke*, 361 Mich. 331, 339, 105 N.W.2d 118, 122 (1960).

This court has not previously denied damages to an injured party because those damages cannot be calculated with specificity. *See Chagnon v. Union-Leader Co.*, 103 N.H. 426, 445, 174 A.2d 825, 837, *cert. denied*, 369 U.S. 830 (1961); *see also Selders v. Armentrout*, 190 Neb. 275, 280, 207 N.W.2d 686, 689 (1973) ("It is no more difficult for juries and courts to measure damages for the loss of the life of a child than many other abstract concepts with which they are required to deal.") If we try complicated patent cases or antitrust matters to a jury, surely we can expect them to arrive at a just sum to compensate the stricken parent.

The fear of judgments in excessive amounts is also not an adequate reason to withhold recovery for loss of a child's society. "The judicial system has adequate safeguards to prevent recovery of damages based on sympathy or prejudice rather than fair and just compensation for the plaintiff's injuries." *Sanchez v. Schindler*, 651 S.W.2d 249, 253 (Tex. 1983). Our juries have never been profligate in their awards. Furthermore, the judiciary has the power to remit

excessive awards, and punitive damages are not recoverable in an action for negligence in this State. The fear is a judicial one—not a realistic one.

In addition, our wrongful death statute, RSA 556:12, does not in any way bar recovery by these plaintiffs. *See, e.g., Corso v. Merrill,* 119 N.H. 647, 406 A.2d 300 (1979) (parents may recover for negligent infliction of emotional distress when child killed.). RSA 556:12 enumerates the elements of damage that may be considered "in connection with other elements allowed by law. . . ." Recovery for the loss of a child's services has always been an element "allowed by law." *See, e.g., Beaudoin v. Beaudoin,* 118 N.H. 325, 327, 386 A.2d 1261, 1263 (1978); *Lessard v. Company,* 83 N.H. 576, 578, 145 A. 782, 784 (1929). Recovery for the loss of a child's society is merely a modernization of this concept.

The parents of Veronica Siciliano, whose daughter suffered cerebral injury but still lives, are of course not affected by the wrongful death statute. They are entitled to recover under the old, but still existing, common-law rule for the value of her lost services and should also be allowed to recover for her lost society, with the common law being modernized to conform with present-day notions; namely, that a child is not an economic unit.

The parents of Lisa Santuccio, whose daughter died in the "Octopus," should also be allowed to recover for their loss of her society. However, since the old common-law rule provides that the right to a child's services is extinguished on the child's death, *Chaloux v. Company,* 75 N.H. 281, 285, 73 A. 301, 303 (1909), the court should abrogate this archaic barrier to an action for a loss of a child's society. In terms of the deprivation suffered by the parent, there simply is not a real distinction between a child who is very seriously injured and one who is killed.

Accordingly, these issues should have been submitted to a jury and, therefore, I dissent.