McKenna v. American Institute, et al. CV-94-671-B    11/03/95
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Marsha A. McKenna and
James F. McKenna

_____v.                                    Civil No. 94-671-B

American Institute for Foreign
 Study Scholarship Foundation, et al.


**O R D E R**

Plaintiffs Marsha McKenna and her son James McKenna ("Jimmy McKenna") claim that an au pair supplied by defendants sexually assaulted Jimmy McKenna.  Both plaintiffs bring claims of negligence, breach of warranty, breach of contract, negligent infliction of emotional distress, and violation of New Hampshire's Consumer Protection Act.  Mrs. McKenna brings claims of misrepresentation and defamation against defendants, and Jimmy McKenna claims that defendants were strictly and/or vicariously liable for the assault.  Defendants move to dismiss both plaintiffs' negligence, breach of warranty, negligent infliction of emotional distress, and Consumer Protection Act claims, and Jimmy McKenna's strict and/or vicarious liability claim.  For the reasons that follow, I grant defendants' motion to dismiss both plaintiffs' Consumer Protection Act claims and Mrs. McKenna's

negligence and negligent infliction of emotional distress claims, I grant in part and deny in part defendants' motion to dismiss both plaintiffs' breach of warranty claims and Jimmy McKenna's strict and/or vicarious liability claims, and I deny defendants' motion to dismiss Jimmy McKenna's claims of negligence and negligent infliction of emotional distress.

## I.   BACKGROUND

Plaintiffs allege the following facts:

For a fee, defendants provide families in the United States with young European adults (called "au pairs") who will care for children and perform other domestic chores in return for room and board and pocket money.  Sometime in the fall of 1992, defendants sent plaintiff Marsha McKenna a brochure explaining their business and a "Host Family Application."  She informed defendants that she needed an au pair to help her care for her son, plaintiff Jimmy McKenna.  After paying a $200 application fee, Marsha McKenna signed a "Host Family Agreement," which incorporates the brochure by reference, and paid defendants' $3,450.00 fee.

Defendants' brochure states, among other things, that all au pairs will be "carefully selected," "screened," and "of good

2

character."  Furthermore, defendants' brochure states that they will provide au pairs with "an intensive four-day orientation and training program."  Defendants sent Marsha McKenna information about a Danish man named Mads Runge Lilholm, whom defendants had approved for placement with the McKennas.  The "Interview Report" which defendants sent Marsha McKenna states:  "Mads is a wonderful young man with a love of children . . . .  He is open and kind and you can't help liking him.  He will be a wonderful au pair."

Based on these and other representations defendants made about Lilholm, Marsha McKenna agreed to accept Lilholm as an au pair.  She picked him up at Logan Airport on December 11, 1992.  Defendants did not provide Lilholm with any orientation or training.  On January 3, 1993, Marsha McKenna left Lilholm alone with Jimmy McKenna at the family's condominium at the Sunday River Ski resort in Bethel, Maine.  Lilholm wrestled Jimmy to the ground, pulled down his pants to expose his genitals, and, using a camera, took pictures of Jimmy's genitals or pretended to do so.  Lilholm told Jimmy that he "would be in a lot of trouble" if he told his parents what Lilholm had done.

The next day, Jimmy went skiing with his mother and seemed emotionally distraught.  The following Saturday, Jimmy told his

father, James M. McKenna, about the incident. Mr. McKenna decided to consult a pediatrician before alarming Mrs. McKenna. On Wednesday, January 13, 1994, Mrs. McKenna again left Jimmy alone at the condominium with Lilholm. En route to Boston, she learned of Lilholm's behavior in a telephone conversation with Mr. McKenna. She called the Bethel police department and asked them to send a police officer to the condominium to protect Jimmy until she arrived. She and Mr. McKenna drove to the condominium in separate cars. Shortly after the they arrived, the Bethel police removed Lilholm from the condominium. Although Lilholm did not admit to actually wrestling Jimmy to the ground and photographing or pretending to photograph his genitals, he admitted that, ostensibly to discipline Jimmy, he had threatened to do so.

When defendants confronted Lilholm, he claimed that Mrs. McKenna concocted the story to punish Lilholm for rebuffing her sexual advances. Without investigating, defendants repeated this version to another host family in an attempt to convince them to accept Lilholm.

Plaintiffs allege that Lilholm caused Jimmy and Mrs. McKenna severe emotional distress, that Jimmy now frequently wets his bed, has nightmares about Lilholm and is obsessed with his own

4

physical safety. Plaintiffs further allege that Jimmy has seen a therapist and that some of Jimmy's emotional damage may be permanent.

On December 30, 1994, plaintiffs filed their Complaint. In Counts I-IV, plaintiffs claim that defendants were negligent in supplying them with a pedophile as an au pair. In Counts V-VIII, plaintiffs claim that defendants breached the warranties defendants gave them and on which they relied in accepting Lilholm as their au pair. In Counts IX-XII, plaintiffs claim defendants breached their contract. In Counts XIII-XVI, plaintiffs claim defendants negligently caused them emotional distress. In Counts XVII-XVIII, Mrs. McKenna claims that defendants misrepresented Lilholm's character and their selection process. In Counts XIX-XX, Mrs. McKenna sues defendants for defamation. In Counts XXI-XXII, Jimmy McKenna claims that defendants are strictly or vicariously liable for Lilholm's actions. In Counts XXIII-XVI, plaintiffs claim defendants violated New Hampshire's Consumer Protection Act.

In their Partial Motion to Dismiss, defendants moved to dismiss all counts except for IX-XII (breach of contract), XVII-XVIII (misrepresentation), and XIX-XX (defamation), presumably

5

for failure to state a claim upon which relief could be granted. Fed. R. Civ. Proc. 12(b)(6).

## II. <u>STANDARD OF REVIEW</u>

When considering a motion to dismiss a complaint, I accept the well-pleaded factual allegations in the complaint as true and then determine whether the allegations are sufficient, under any theory, to state a claim for the relief sought. <u>Armstrong v. Jefferson Smurfit Corp.</u>, 30 F.3d 11, 12 (1st Cir. 1994). Neither bald assertions nor legal conclusions enjoy the presumption of truth. <u>United States v. AVX Corp.</u>, 962 F.2d 108, 115 (1st Cir. 1992). I will, however, draw all reasonable inferences in plaintiff's favor. <u>Rockwell v. Cape Cod Hosp.</u>, 26 F.3d 254, 255 (1st Cir. 1994).

## III. <u>CHOICE OF LAW</u>

I must use New Hampshire's choice-of-law rules when, as in this case, jurisdiction is based on diversity of citizenship. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>American Title Insurance Co. v. East West Financial Corp.</u>, 959 F.2d 345, 348 (1st Cir. 1992). Plaintiffs' claims

sound in both contract and tort. In contract actions, in the absence of an express agreement by the parties, New Hampshire applies the "the law of the State with the most significant relationship to the contract." Glowski v. Allstate Insurance Co., 134 N.H. 196, 197 (1991); Consolidated Mutual Insurance Co. v. Radio Foods Corp., 108 N.H. 494, 496-97 (1968). In tort actions, the New Hampshire Supreme Court applies the flexible "Leflar" test, examining five main choice influencing factors to determine which state's law applies.[1] Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 14 (1988).

I find that New Hampshire law is clearly the correct law to apply to both plaintiffs' contract and tort claims. Most of the significant events that created the alleged contract between plaintiff Marsha McKenna and defendants are alleged to have taken place in New Hampshire. Plaintiffs allege that Mrs. McKenna read

---

[1] These factors are:
   1) the predictability of results;
   2) the maintenance of reasonable orderliness and good
      relationships among the States in the federal
      system;
   3) simplification of the judicial task
   4) advancement of the governmental interest of the
      forum;
   5) the court's preference for what it regards as the
      sounder rule of law.
Id.

7

defendants' brochure in New Hampshire, filled out the "Host Family Application" in New Hampshire, and signed the "Host Family Agreement" in New Hampshire. Furthermore, because the McKennas reside in New Hampshire, the contract was to be performed primarily in New Hampshire. Therefore, New Hampshire is the state with the most significant relationship to the contract.

I must also rely on New Hampshire law to decide plaintiffs' tort claims. Plaintiffs argue that the alleged tortious acts physically occurred in a variety of jurisdictions: defendants' London office failed to screen Lilholm; defendants may have decided to place Lilholm with the McKennas at their headquarters in Connecticut; defendants' regional manager, based in Massachusetts, failed to supervise Lilholm; Mrs. McKenna picked up Lilholm at Logan Airport in Massachusetts; and Lilholm sexually molested Jimmy McKenna in Maine. However, the parties agree that Lilholm was hired to work for Mrs. McKenna primarily in New Hampshire, and that both plaintiffs are domiciled here. To apply variously the law of England, Connecticut, New Hampshire, and Maine depending only on where physical acts chanced to have happened would complicate my task enormously and lead to unpredictable, perhaps contradictory, results without furthering any of the aims of the Leflar choice-of-law test.

8

Therefore, I will decide plaintiff's tort claims based on the law of New Hampshire.

## IV. DISCUSSION

### A. Counts I-II, XIII-XIV, Marsha McKenna, Negligence and Negligent Infliction of Emotional Distress

In Counts I-II and XIII-XIV, Marsha McKenna essentially requests compensation for the emotional distress defendants caused her by negligently selecting an alleged pedophile to care for her son. In Corso v. Merrill, 119 N.H. 647 (1979), the New Hampshire Supreme Court held that to state a claim under this theory, in addition to alleging causation, bystanders such as Mrs. McKenna must allege that the harm they suffered was foreseeable. Id. at 656. Bystanders' emotional distress is "foreseeable" if (1) they had a close relationship with the victim, (2) they were near the victim when s/he was injured, and (3) they perceived the incident when it happened and saw the victim immediately afterwards. Id. In addition, bystanders' must allege that their emotional injury was manifest in objective physical symptoms. Id.; Thorpe v. State Dept. of Correections, 133 N.H. 299, 303-05 (1990).

9

Mrs. McKenna does not satisfy the requirements of geographic and temporal proximity announced in <u>Corso</u>. She alleges that she was not at the condominium when Lilholm molested her son, and that she did not learn of the assault until nine days afterward. In addition, she fails to allege that she suffered any objective physical harm from emotional distress caused by defendants' negligence.[2]

Plaintiffs attempt to distinguish this case from <u>Corso</u> and its progeny by pointing to Counts I-IV, in which they state that defendants directly owed Mrs. McKenna a duty of care. They claim that this allegation transforms Mrs. McKenna from a bystander into a direct victim of defendants' negligence. I need not accept such a bald legal conclusion as true. <u>AVX Corp.</u>, 962 F.2d at 115. Furthermore, even if plaintiffs' Complaint sufficiently alleges that defendants directly owed Marsha McKenna a duty of

---

[2]Plaintiffs submitted an affidavit with their objection to defendants' motion to dismiss in which Mrs. McKenna, a diabetic, alleges that, beginning shortly after she learned that Lilholm had molested her son and continuing for two years, her physicians could not keep her blood sugar levels under control. She further alleges that she believes that the escalation of her blood sugar level was related to the distress caused by defendants' negligence. Irrespective of the relevance of this affidavit, I may not consider evidence extraneous to the allegations in plaintiffs complaint to decide a motion to dismiss for failure to state a claim. <u>See</u> Fed. R. Civ. P. 12(b).

10

care, the injury she alleges is the same as the injury alleged by the parents in Corso: emotional distress due to the injury defendants negligently inflicted on her son. I decline to eviscerate Corso based solely on an abstract distinction. Plaintiffs claim that Lunt v. Philbrick, 59 N.H. 59 (1879), a one-paragraph opinion written 116 years ago, provides an exception to the requirements of Corso for parents whose children are sexually molested. In Lunt, the trial court instructed the jury that if it found that defendant had fraudulently seduced plaintiff's daughter by promising her and plaintiff that he would marry her, and that defendant had impregnated plaintiff's daughter, it could compensate plaintiff for the "injury done to his wounded and mortified feelings." Id. at 60. The New Hampshire Supreme Court merely upheld the jury instructions, stating only that "General damages are such as may be presumed to result necessarily from the wrong complained of." Id.

Given that the New Hampshire Supreme Court has cited Lunt only twice in this century, and even then only in passing, it is doubtful that Lunt retains any value as precedent.[3] Even if it

---

[3]In Thorpe, after citing a string of cases in support of the objective physical manifestation requirement, the court cites Lunt in opposition. 133 N.H. at 305. In the next sentence, it

11

does, the court distinguishes it from cases like the present one because <u>Lunt</u> involved an intentional tort, not mere negligence. <u>See</u> <u>Siciliano v. Capitol City Shows</u>, 124 N.H. 719, 726 (1984). In <u>Siciliano</u>, one child was seriously injured and another was killed when the defendants' amusement park ride malfunctioned. <u>Id.</u> at 723. The court refused to recognize a cause of action for loss of society of a negligently injured or killed child because doing so would abrogate the "well-defined limiting factors" on liability established in <u>Corso</u>. <u>Id.</u> at 727-28. The court specifically distinguished <u>Lunt</u> and several other cases because they do not deal with negligence, but instead concern intentional interference with parental custody, which exposes the tortfeasor to greater liability. <u>See</u> <u>id.</u>

Plaintiffs do not allege that defendants committed any intentional torts. I see no reason to extrapolate from <u>Lunt</u> to extend liability beyond the limits established in <u>Corso</u>. Therefore, I dismiss plaintiff Marsha McKenna's claims of negligence and negligent infliction of emotional distress.

_____

holds that "expert testimony is required to prove that the plaintiff experienced physical symptoms from the alleged emotional distress." <u>Id.</u> This indicates that the court considered, and rejected, extending the holding of <u>Lunt</u> beyond its facts.

12

**B.   Counts III-IV, XV-XVI, James McKenna, Negligence and Negligent Infliction of Emotional Distress.**

Defendants argue that I must dismiss Jimmy McKenna's negligence claims for two reasons.  First, defendants argue that they owed Jimmy McKenna no duty of care independent of the contractual duties they may have owed him as a possible third-party beneficiary to the contract with his mother.  Regardless of whether Jimmy McKenna was a third-party beneficiary, I find that plaintiffs have sufficiently alleged that defendants owed him a duty of care which they breached.

In their motion to dismiss, defendants correctly point out that New Hampshire does not recognize a cause of action for negligent failure to perform a contract.  PK's Landscaping, Inc. v. New England Tel. and Tel. Co., 128 N.H. 753, 757 (1986); Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 613 (1978); Barrett v. New England Tel. and Tel. Co., 80 N.H. 354, 360 (1922); DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 915 (1992).  In other words, a plaintiff may not recover in tort for breach of a contractual duty.  For example, in Lawton, the defendant insurance company refused to reimburse the plaintiff according to the terms of the policy.  118 N.H. at 609.  Plaintiff sued defendant in tort for recklessly and/or

13

negligently failing to carry out the terms of the policy. Id. The New Hampshire Supreme Court held that plaintiff failed to state a claim because he failed to allege "a breach of duty owed by the defendant to the plaintiff independent of the contract." See id. at 613.

The same transactions or relations which create a contractual duty, however, may also create a separate duty of care which may be the basis of a cause of action in tort. See J. Dunn & Sons, Inc. v. Paragon Homes of New England, Inc., 110 N.H. 215, 217-218 (1970); Busick v. Homeowners Loan Corp., 91 N.H. 257, 258 (1941); Dustin v. Curtis, 74 N.H. 266, 269 (1907). For example, in Dunn, plaintiffs sued defendant, a supplier of pre-fabricated homes, in tort, claiming that in breaching its contract with them, defendant caused "irreparable harm to their reputations and business prospects . . . loss of profits, embarrassment, and mental anguish."[4] 110 N.H. at 216. The court explained:

> The fact that the duty alleged to have been violated is related to obligations growing out of or coincidental with a contract will not prevent the action from being

---

[4]Presumably, the plaintiffs sued in tort to avoid an arbitration clause favorable to the defendant. See id. at 216-17.

14

> one in tort. The purpose of the contractual duty is to secure the receipt of the thing bargained for, while the tort duty which results from the contract relation of the parties is that a party must refrain from conducting itself so as to cause a particular harm to the other party.

Id. at 218.

It then held that the plaintiffs had successfully stated claims in tort against defendant for intentional and negligent interference with their business. Id.

More specifically, in New Hampshire, employers have a non-contractual duty to hire, train, and supervise their employees so that they will not cause unreasonable harm in the course of their employment. See Cutter v. Town of Farmington, 126 N.H. 836, 840-841 (1985). Employers are directly liable, not liable via respondeat superior, to parties injured by their negligently hired, trained, or supervised employees. Id. For example, in Palmer v. Keene Forestry Association, 80 N.H. 68 (1922), plaintiff employed defendant to cut some trees in his field. Id. at 68. While performing the work, one of defendant's employees dropped a lit match into dry grass, causing a fire which destroyed plaintiff's property. Id. The court held that if defendant knew or should have known that its employees had a propensity to smoke while working and would work in plaintiff's

15

dry field, defendant was directly liable to plaintiff for the damage caused by the fire. Id. at 69-70.

Construing plaintiffs' factual allegations in the light most favorable to them, I find that plaintiffs have alleged that defendants owed Jimmy McKenna a non-contractual duty to select, train, and supervise the au pair defendants placed with the McKennas to avoid subjecting Jimmy McKenna to an alleged pedophile.

Second, defendants argue that paragraph four, page two of the Host Family Agreement (signed by Marsha McKenna) releases them from liability for anything less than gross or wilful negligence. I reject defendants' arguments. Neither party has addressed the question of whether parents may release their children's right to bring tort claims under the circumstances presented in this case. I am unwilling to decide this crucial issue without some argument from the opposing parties.

Alternatively, I deny defendants' motion to dismiss because they have failed to satisfy the requirements necessary for me to execute any release from liability. To recognize an exculpatory clause under New Hampshire law, I must find that defendants have shown that:

16

1)   the clause does not contravene public policy due
     to a special relationship between the parties or a
     disparity in bargaining power;

2)   the plaintiff understood the significance of the
     exculpatory provision or a reasonable person would
     have understood the significance of the exculpatory
     provision; and

3)   the parties contemplated the plaintiff's claims when
     they executed their agreement.

See Wright v. Loon Mountain Recreation Corp., 663 A.2d 1340,

1341-42 (1995); Barnes v. N.H. Karting Assoc., 128 N.H. 102, 106-

07 (1986).

Without deciding the meaning of the paragraph which

defendants cite, I find that defendants have not shown that

plaintiffs' allegations, read in the light most favorable to

plaintiffs, satisfy the elements necessary for me to execute any

exculpatory provision.

## C.   Counts V-VIII - Breach of Warranty

Plaintiffs allege that defendants breached both implied and

express warranties.  New Hampshire law does not recognize a cause

of action for breach of implied warranty in purely service

contracts.  See Bolduc v. Herbert Schneider Corp., 117 N.H. 566,

569 (1977); Brescia v. Great Road Realty Trust, 117 N.H. 154, 157

(1977) (no cause of action for breach of implied warranty beyond

17

that provided for sales of goods by N.H. Rev. Stat. Ann. §§ 382-A:2-314-15). Therefore, I dismiss Counts V-VIII to the extent that they rely on a breach of implied warranty theory.

Defendants argue that I should dismiss plaintiffs' breach of express warranty claims for two reasons. First, defendants contend that plaintiffs failed to allege that defendants gave them any express warranties. This is simply incorrect. In paragraphs 13-15 of their complaint, plaintiffs allege that defendants expressly warranted, among other things, that Lilholm was "of good character," and that he was "a wonderful young man with a love of children [who would be] a wonderful au pair." Second, defendants argue that I should dismiss the breach of warranty claim because it is identical to plaintiffs' breach of contract claim. Read in the light most favorable to plaintiff, I find that plaintiffs' breach of warranty and breach of contract claims, though similar, are not identical. The breach of warranty claim may be construed as a claim for defendants' failure to provide an au pair of good character, as promised. The breach of contract claim may be construed as a claim for defendants' failure to screen Lilholm, train Lilholm, and to supervise Lilholm adequately. Regarding plaintiffs' breach of express warranty theory, defendants motion to dismiss Counts V-

18

VIII is denied.


**D.    Counts XXI-XXII - Strict or Vicarious Liability
for Battery of Jimmy McKenna**

In Counts XXI-XXII, plaintiffs allege that defendants are strictly or vicariously liable to Jimmy McKenna for Lilholm's battery because they were engaged in an inherently dangerous activity.  Generally, under New Hampshire law, a party who undertakes an inherently dangerous activity has a non-delegable duty to protect third parties from injury resulting from that activity.  Elliott v. Public Serv. Co. of New Hampshire, 128 N.H. 676, 679 (1986).  The activity must be dangerous in itself, not merely made dangerous by the negligent performance of the work. Arthur v. Holy Rosary Credit Union, 656 A.2d 830, 833; Elliott, 128 N.H. at 679; Thomas v. Harrington, 72 N.H. 45, 46-47 (1903). Construction work, for example, is generally not considered to be inherently dangerous by the New Hampshire Supreme Court.  Arthur, 656 A.2d at 833.  There is nothing inherently dangerous about selecting au pairs and placing them in charge of small children. As plaintiffs state in their brief, the danger was created by the negligent performance of the work.  Therefore, regarding strict liability, I grant defendants' motion to dismiss Counts XXI-XXII

19

for failure to state a claim for strict liability.

Alternatively, plaintiffs claim that defendants are vicariously liable for Lilholm's battery under three theories. First, plaintiffs claim that Lilholm was defendants' employee for the purposes of respondeat superior. Under the doctrine of respondeat superior, an employer may be held liable for the torts of an employee which the employee committed within the scope of employment. Trahan-Laroche v. Lockheed Sanders, Inc., 657 A.2d 417, 419 (1995). Defendants argue that I must dismiss plaintiffs' claim of respondeat superior because plaintiffs do not explicitly allege that Lilholm was defendants' employee. "Employer" and "employee" are terms of art under the doctrine of respondeat superior; Lilholm need not have been paid by defendants in order to be deemed their employee to establish liability. See Boissonault v. Bristol Federated Church, 138 N.H. 476, 478 (1994) (volunteers may be employees for purposes of respondeat superior). While control is a significant factor, defendants need not have controlled the exact "manner and means of the performance of the work in order for the doctrine to come into play." Hunter v. R.G. Watkins & Son, Inc., 110 N.H. 243, 246 (1970). To determine whether a person is an "employee" for the purposes of respondeat superior, the Supreme Court of New

20

Hampshire examines the totality of the circumstances, asking "`whether on all the facts presented the community would consider the person an employee.'"  Id., quoting Hunter v. R.G. Watkins & Son, Inc., 110 N.H. 243, 246 (1970).

Read in the light most favorable to plaintiffs, I find that their complaint and attached exhibits contain alleged facts sufficient to state a claim of respondeat superior under the test announced in Hunter.  Plaintiffs allege that defendants selected Lilholm, matched him with their family, were responsible for training him, and had a community counselor who would supervise and aid Lilholm throughout the year.  More importantly, plaintiffs allege that defendants set the terms of Lilholm's employment, including what Lilholm's duties were, how many hours Lilholm worked per week, how much Lilholm would be paid, how often Lilholm would be paid, and how much vacation Lilholm would have.  If defendants decided that plaintiffs were not abiding by defendants' rules, defendants could remove Lilholm from their home without paying a refund.  Plaintiffs did not have a reciprocal power to fire Lilholm if he was unsatisfactory.  Rather, they were supposed to follow procedures established and governed by defendants.  These allegations, read in the light most favorable to plaintiffs, sufficiently show that Lilholm was

21

defendants' employee for the purposes of respondeat superior under New Hampshire's "totality of the circumstances" test. Accordingly, I deny defendants' motion to dismiss plaintiffs' claim of vicarious liability insofar as it is based on a respondeat superior theory.

Second, plaintiffs also assert that defendants are vicariously liable for Lilholm's battery because Lilholm and defendants were engaged in the "joint enterprise" of placing Lilholm in charge of children. To determine whether persons are engaged in a joint enterprise or joint venture, New Hampshire courts examine whether they have "mutual control" over the venture. See Lefebvre v. Waldstein, 101 N.H. 451, 455 (1958); Glaser v. Medford-Marlboro Knit Gaiter Co., 93 N.H. 95, 99-101 (1944). As stated above, defendants, not Lilholm or plaintiffs, had control over most of the important aspects of Lilholm's employment. Therefore, I grant defendants' motion to dismiss plaintiffs claim of vicarious liability based on the theory that Lilholm and defendants were engaged in a joint enterprise.

Third, plaintiffs argue that defendants are vicariously liable to Jimmy McKenna because they created a situation in which Lilholm could assault him. In the only case which plaintiffs cite in support of this theory, the court explains that it is _not_

22

a theory of vicarious liability, but of direct liability for creating a dangerous situation.  See Mulloy v. U.S., 884 F.Supp. 622, 632 (1995).  I have already addressed this theory in part B of this order.  To the extent that plaintiffs rely on it to support vicarious liability, I dismiss it.

**E.    Counts XXIII-XVI - Consumer Protection Act**

Plaintiffs claims under the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:3 (1993) ("Act"), are barred because they failed to file their complaint within two years after defendants made the alleged misrepresentations.  Section 358-A:3 states, in pertinent part:  "The following transactions shall be exempt from the provisions of this chapter:  IV-a. Transactions entered into more than 2 years prior to the complaint . . . "

The two-year time-limit within which plaintiffs must file a complaint in order to state a claim under the Act begins to run when the allegedly "unfair or deceptive" business practice prohibited by the Act is committed, not when the deception actually causes harm or when plaintiffs know or should know that they were deceived.  Catucci v. Lewis, 1995 WL 574232 *1 (N.H.); Zee-Bar, Inc.-N.H. v. Kaplan, 792 F.Supp. 895, 901-02 (D.N.H. 1992); City of Manchester v. National Gypsum Co., 637 F.Supp.

23

646, 655-56 (D.R.I. 1986); see, e.g., Gautschi v. Auto-Body Discount Center, Inc., 660 A.2d 1076, 1078 (1995) (statute tolled when misconduct occurred, not when plaintiff learned of misconduct).

Plaintiffs do not allege that defendants made any misrepresentations in violation of the Consumer Protection Act after Marsha McKenna picked up Lilholm at Logan Airport on December 11, 1992. Plaintiffs filed their Complaint on December 30, 1994. Therefore, their claim under the Act is barred because they failed to bring it within the two-year deadline, and I must grant defendants' motion to dismiss.

## V. CONCLUSION

In summary, I dispose of defendants' partial motion to dismiss (document no. 6) as follows:

| | |
|---|---|
| Counts I-II | Granted. |
| Counts III-IV | Denied. |
| Counts V-VIII | Granted in part and denied in part. |
| Counts XIII-XIV | Granted. |
| Counts XV-XVI | Denied. |
| Counts XXI-XXII | Granted in part and denied in part. |
| Counts XXIII-XVI | Granted. |

24

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

November 3, 1995

cc:  Robert Shea, Esq.
     Thomas Kehr, Esq.
     James Wheat, Esq.
     Peter DeGelleke, Esq.